# Illinois Official Reports

## Appellate Court

---

**Chicago Tribune v. College of Du Page**, 2017 IL App (2d) 160274

---

| | |
|---|---|
| Appellate Court Caption | THE CHICAGO TRIBUNE, Plaintiff-Appellee and Cross-Appellant, v. THE COLLEGE OF DU PAGE and THE COLLEGE OF DU PAGE FOUNDATION, Defendants-Appellants and Cross-Appellees. |
| District & No. | Second District<br>Docket No. 2-16-0274 |
| Filed | May 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 15-MR-580; the Hon. Robert G. Gibson, Judge, presiding. |
| Judgment | Affirmed; cross-appeal dismissed; cause remanded. |
| Counsel on Appeal | Michael P. Adams and Timothy D. Elliot, of Rathje & Woodward, LLC, of Wheaton, for appellant College of Du Page.<br><br>James L. Ryan and Matthew T. Caruso, of Roberts & Caruso, of Wheaton for appellant College of Du Page Foundation.<br><br>Karen H. Flax, of Tribune Publishing Company, and Alexandra K. Block and Daniel M. Feeney, of Miller Shakman & Beem, LLP, both of Chicago, for appellee. |

JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, the Chicago Tribune (Tribune), brought suit against defendants, the College of Du Page (College) and the College of Du Page Foundation (Foundation), pursuant to the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* West 2014)), seeking disclosure of a federal grand jury subpoena that was served on the Foundation on or about April 13, 2015. The Tribune and defendants filed cross-motions for summary judgment. On March 17, 2016, the circuit court granted the Tribune's motion as to both defendants and denied defendants' motions, holding that the subpoena was subject to disclosure under section 7(2) of FOIA. 5 ILCS 140/7(2) (West 2014). In so ruling, the circuit court found that the College had contracted with the Foundation to perform a governmental function on its behalf and that the subpoena directly related to that governmental function. The Tribune thereafter filed a petition for attorney fees under section 11(i) of FOIA. 5 ILCS 140/11(i) (West 2014). The circuit court later allowed the Tribune to voluntarily withdraw the fee petition without prejudice on July 18, 2016, so that it could refile it at the conclusion of this appeal.

¶ 2 Defendants appeal the circuit court's March 17, 2016, order granting the Tribune's motion for summary judgment and the July 18, 2016, order allowing the Tribune to withdraw its fee petition without prejudice. Although summary judgment was entered in the Tribune's favor, it has filed a cross-appeal, contending that the circuit court erred in ruling that the Foundation is not a subsidiary public body under FOIA. For the following reasons, we affirm the circuit court's judgment, dismiss the Tribune's cross-appeal, and remand for further proceedings.

¶ 3 I. BACKGROUND

¶ 4 A. College of Du Page

¶ 5 The College is a community college in Glen Ellyn, Illinois. It was organized under the Public Community College Act (Act) (110 ILCS 805/1-1 *et seq.* (West 2014)) and is a "public body" as that term is defined in section 2(a) of FOIA. 5 ILCS 140/2(a) (West 2014). In its 2015 fiscal year, the College's enrollment exceeded 28,000 students and it was the second largest provider of undergraduate education in the state. That year, the College's annual budget exceeded $300 million. Its principal sources of revenue were student tuition and property taxes levied in Community College District 502, which encompasses most of Du Page County and portions of Cook and Will Counties.

¶ 6 The College is governed by an eight-member board of trustees (College Board), which is composed of one nonvoting student and seven individuals elected by the voters of District 502. The College Board is responsible for overseeing the mission, leadership, and operations of the College and has the powers that are authorized to it by section 3-7 of the Act (110 ILCS 805/3-7 (West 2014)). The College president and all other administrators report to the

College Board.

¶ 7                                    B. College of Du Page Foundation

¶ 8          The Foundation was incorporated in Illinois as a not-for-profit corporation in 1967—the same year that the College first opened its doors to the public. As expressed in its bylaws, the Foundation exists to support the educational mission of the College by raising money to fund the College's academic programs, capital programs, and student scholarships. It does not support any other institutions or individuals. The Foundation assists the College in soliciting private financial donations, and it manages, invests, and administers all private gifts and resources, including endowments and real property. The Foundation is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3) (2006)).

¶ 9          As provided in its bylaws, the Foundation is managed by a board of directors (Foundation Board), which is tasked with determining how to hold, manage, and administer all private donations, subject to the terms and conditions prescribed by the donor. In its sole discretion, the Foundation Board may accept or reject any contribution or gift. The Foundation Board and its officers owe fiduciary duties to the Foundation, including the duty of loyalty. The Foundation can indemnify its directors, officers, employees, or agents against expenses, judgments, and fines, and it can purchase and maintain insurance on behalf of those individuals.

¶ 10         The Foundation Board is organized into three groups. "Group 1" consists of between 32 and 37 members whom other members of the Foundation Board select to serve specified terms. "Group 2" consists of the College's president, the Foundation's executive director, and one member of the College Board, as *ex officio* members. "Group 3" consists of honorary members, emeritus directors, recognized community leaders, and the like. Only Group 1 is entitled to vote, and any action by a majority of Group 1 directors constituting a quorum is an official act of the Foundation Board. The bylaws require the Foundation Board to have a minimum of four regular meetings per year, in addition to an annual meeting held each June. All such meetings are held at the College.

¶ 11         The bylaws provide that the Foundation's daily business is overseen by the executive director of the Foundation, who "shall be employed by the College." In practice, the executive director is the College's vice president for development. The position, formally titled "Executive Director of the College of Du Page Foundation/Vice President for Development," has a single job description that outlines responsibilities to both the Foundation and the College. The executive director is "responsible for the leadership, oversight, development, implementation[,] and evaluation of institutional fundraising," and "serves as a key leadership team member and an active participant in making strategic decisions affecting the College of Du Page and its Foundation." At all times pertinent to this appeal, this position was held by Catherine Brod. The executive director is supported by the "Assistant Vice President for Development/Associate Executive Director of the Foundation," which is another dual-role position at the College and the Foundation. At all times pertinent to this appeal, this position was filled by Karen Kuhn.

¶ 12         The day-to-day business of the Foundation is carried out by its approximately 11-member staff, which consists entirely of paid civil-servant employees of the College. They each have one telephone extension and one College-provided email address for use on both College and

Foundation business. These employees work interchangeably on College and Foundation business throughout their workday and do not maintain separate timesheets to account for their work. Rather, they annually estimate the percentages of time spent working on College business and Foundation business. For example, in each of the 3½ years that Brod served as executive director, she reported that she spent 50% of her time working on Foundation business and 50% of her time working on College business. For the percentage of time that a College employee estimates he or she worked on Foundation business, the same percentage of his or her salary is deemed an "in-kind" donation from the College to the Foundation. In its 2015 fiscal year, the Foundation received $785,000 in "in-kind" staff support from the College. These staff members receive the same health benefits that are available to all full-time College employees and participate in the State Universities Retirement System (SURS).

¶ 13    In its 2014 fiscal year, the Foundation earned or raised $11.2 million, including approximately $5 million in private fundraising, and awarded roughly $1.5 million to the College, its students, and its faculty. At the conclusion of its 2014 fiscal year, the Foundation had approximately $14.5 million in assets. The Foundation's bylaws provide that, in the event of its dissolution, all Foundation assets, less any liabilities, are to be distributed to the College.

¶ 14                              C. Memorandum of Understanding

¶ 15    On June 22, 2009, the College and the Foundation entered into a "Memorandum of Understanding" (MOU), detailing their respective contractual obligations Pursuant to the MOU, the Foundation agreed, *inter alia*, (1) to act as "the primary depository of private donations on behalf of the College"; (2) "[t]o hold, manage and distribute such assets in [the Foundation's] possession for the dedicated purpose of supporting the mission of the College"; (3) "[t]o maintain and manage an endowment" for the College; (4) "[t]o identify, cultivate, evaluate and solicit" active and prospective donors; (5) "[t]o plan, direct and implement all phases of private sector fundraising efforts"; and (6) "[t]o pay or reimburse the College president for expenses related to fundraising activities or otherwise advancing the College/Foundation."

¶ 16    In return, the College agreed, *inter alia*, to provide the Foundation with College personnel to staff the Foundation, as well as to provide fully furnished and equipped office space on the College's campus, rent-free. The College also agreed to have the College president assume a "prominent role in the Foundation's fundraising activities." Under the MOU, after consultation with the Foundation Board, the College president is entitled to recommend an individual to serve as the executive director. The College also agreed to consider the executive director's recommendations regarding the Foundation's staffing needs and to allow the Foundation to use the College's name, logo, and marketing brand.

¶ 17    In the event that the Foundation ceases to exist, the MOU provides that the Foundation will transfer all of its assets and property to the College or to any foundation affiliated with the College that is organized and operated exclusively for charitable and educational purposes. The MOU's initial term was five years, but it explicitly provides that it remains in effect from year to year unless either party terminates it—either without cause upon 90 days' prior written notice or with cause after a party's default and failure to timely cure it.

¶ 18                  D. The Tribune's FOIA Requests and Subsequent Litigation

¶ 19      The instant matter stems from a series of FOIA requests sent by the Tribune in April 2015. In its first FOIA request, on April 1, 2015, the Tribune sought from the College "[a]ny copies of grand jury subpoenas for the College of Du Page Foundation which are in possession, physically or in electronic form, of the college, any of its administrators, senior managers, president, board members, paid consultants, lobbyists or representatives" (Du Page grand jury subpoena). One week later, the College's FOIA officer replied that it did not have any documents responsive to the request. On April 14, 2015, the Tribune sent FOIA requests to both the College and the Foundation, seeking various documents regarding College administrators' expenses that were reimbursed by the Foundation through the Foundation's leadership-cultivation account. The College replied that it did not have any documents responsive to the request, and the Foundation replied that it was not subject to FOIA.

¶ 20      Believing that the Foundation was recently served with a federal grand jury subpoena, the Tribune issued its final FOIA requests to the College and the Foundation on April 16, 2015, seeking copies of all state and federal subpoenas received by the Foundation since April 1, 2015 (federal grand jury subpoena). The Foundation replied by asserting that it was not subject to FOIA, because it was a nongovernmental not-for-profit corporation. The following day, the College responded by stating that it did not have any documents responsive to the request.

¶ 21      On April 29, 2015, the Tribune filed a complaint against the College and the Foundation, seeking declaratory and injunctive relief under FOIA. During the circuit court proceedings, the College produced the Du Page grand jury subpoena and all nonexempt leadership-cultivation documents, but it did not produce the federal grand jury subpoena. Instead, it produced affidavits from two individuals, Joseph Moore and Brod, stating that neither the College nor the Foundation's staff possessed the subpoena. The College thereafter moved to dismiss the complaint, arguing that the Tribune's claims against it were moot, as the federal grand jury subpoena was not in the College's custody or control, and therefore the College could not be compelled to produce it. The circuit court denied the College's motion, stating that it had to accept as true the Tribune's well-pleaded factual allegation that College employees had at one point possessed the subpoena.

¶ 22      After further proceedings, the parties filed cross-motions for summary judgment with respect to the federal grand jury subpoena, which was the only requested document that remained undisclosed. In its motion, the Tribune raised three legal theories in support of its position that the subpoena was subject to disclosure under FOIA. It argued that (1) the Foundation was a subsidiary public body within the meaning of section 2(a) of FOIA (5 ILCS 140/2(a) (West 2014)), (2) the Foundation had contracted with the College to perform a governmental function within the meaning of section 7(2) of FOIA and the subpoena related directly to that function (5 ILCS 140/7(2) (West 2014)), and (3) the subpoena was a public record of the College, due to the College's alleged handling of it, and the subpoena remained within the College's direct control.

¶ 23      On March 17, 2016, the circuit court granted the Tribune's motion for summary judgment against both defendants and denied defendants' motions for summary judgment. In announcing its ruling, the circuit court touched on each of the Tribune's three arguments. First, applying the three-factor test as set forth in *Rockford Newspapers, Inc. v. Northern*

*Illinois Council on Alcoholism & Drug Dependence*, 64 Ill. App. 3d 94 (1978), the circuit court ruled that the Foundation was not a subsidiary public body, noting the Foundation's formal legal nature and the College's lack of direct control over the Foundation Board.

¶ 24  The circuit court agreed with the Tribune's second argument, however, and ruled that the federal grand jury subpoena was a public record in the Foundation's possession, obtained while the Foundation was under contract to perform a governmental function on behalf of the College, that related directly to that governmental function under section 7(2) of FOIA. Having found in the Tribune's favor under section 7(2), the circuit court declined to address whether the subpoena was a public record of the College due to the College's alleged handling of it.

¶ 25  The Tribune thereafter filed a petition for attorney fees under section 11(i) of FOIA. 5 ILCS 140/11(i) (West 2014). On July 18, 2016, the circuit court allowed the Tribune to voluntarily withdraw its fee petition without prejudice in order to defer the issue of attorney fees until after the appeal.

¶ 26  Though the Tribune won summary judgment in the circuit court, it contends that the court erred in holding that the Foundation was not a subsidiary public body within the meaning of section 2(a) of FOIA. Thus, all parties appeal the circuit court's March 17, 2016, summary judgment order. Defendants also appeal the July 18, 2016, order allowing the Tribune to withdraw its fee petition without prejudice. Again, the sole requested record that remains undisclosed is the federal grand jury subpoena.

¶ 27                                     II. ANALYSIS

¶ 28  As an initial matter, we note that the Tribune's cross-appeal is improper. Our supreme court has explained that "[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment." *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983). "It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons, conclusion or findings below." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 414 Ill. 275, 282-83 (1953). In the circuit court proceedings, the Tribune prevailed on its motion for summary judgment and was awarded all of the relief sought therein. Where the circuit court grants summary judgment in favor of a party, that party cannot file a cross-appeal to seek relief from the summary judgment order. *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 25. Accordingly, we must dismiss the Tribune's cross-appeal, and we need not determine whether the circuit court erred in holding that the Foundation is not a subsidiary under section 2(a) of FOIA. Nevertheless, in our disposition of defendants' appeal, we consider the arguments the Tribune raises in its cross-appeal because "an appellee may argue in support of the judgment on any basis which appears in the record." *Hayes v. Board of Fire & Police Commissioners*, 230 Ill. App. 3d 707, 710 (1992). We now turn to the merits.

¶ 29  We review a grant of summary judgment under the *de novo* standard of review. *Dumke v. City of Chicago*, 2013 IL App (1st) 121668, ¶ 11. Summary judgment motions are governed by section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2014)). Summary judgment should be granted only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735

ILCS 5/2-1005(c) (West 2014). Where parties file cross-motions for summary judgment, they agree that only a question of law is involved, and they invite the court to decide the case based upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Even where cross-motions are filed, however, the court is not obligated to grant summary judgment. *Falcon Funding, LLC v. City of Elgin*, 399 Ill. App. 3d 142, 147 (2010). We also review *de novo* the issue of a circuit court's subject matter jurisdiction over a given set of proceedings. *In re Estate of Ahern*, 359 Ill. App. 3d 805, 809 (2005).

¶ 30    Under FOIA, Illinois has established a public policy that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them. 5 ILCS 140/1 (West 2014). "It is a fundamental obligation of government to operate openly and provide public records as expediently and efficiently as possible in compliance with this Act." *Id.* FOIA also provides that "[r]estraints on access to information, to the extent permitted by this Act, are limited exceptions to the principle that the people of this State have a right to full disclosure of information relating to the decisions, policies, procedures, rules, standards, and other aspects of government activity that affect the conduct of government and the lives of any or all of the people." *Id.*

¶ 31    Section 1.2 of FOIA makes clear that "[a]ll records in the custody or possession of a public body are presumed to be open to inspection or copying. Any public body that asserts that a record is exempt from disclosure has the burden of proving by clear and convincing evidence that it is exempt." 5 ILCS 140/1.2 (West 2014). Section 3(a) establishes that "[e]ach public body shall make available to any person for inspection or copying all public records, except as otherwise provided in Sections 7 and 8.5 of this Act." 5 ILCS 140/3(a) (West 2014).

¶ 32    We begin our review by considering section 7(2) of FOIA, under which the circuit court granted the Tribune relief. It provides as follows:

> "A public record that is not in the possession of a public body but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the public body, and that directly relates to the governmental function and is not otherwise exempt under this Act, shall be considered a public record of the public body, for purposes of this Act." 5 ILCS 140/7(2) (West 2014).

¶ 33    Defendants maintain that the circuit court erred when it held that the federal grand jury subpoena was a public record of the College by way of section 7(2). Specifically, they argue that the subpoena does not qualify as a public record and that the Foundation does not perform a governmental function. The College also maintains that the Tribune's claims against it became moot in July 2015, when it turned over all of the documents that were responsive to the Tribune's FOIA requests that were within the College's possession. We address each of these issues in turn.

¶ 34    At the outset, the College argues that it is impossible to grant relief under section 7(2) without first determining whether the requested documents independently satisfy the definition of "public records." In support, the College points to the language of section 7(2), which begins with the phrase "[a] *public record* that is not in the possession of a public body." (Emphasis added.) *Id.* The College also highlights the "undisputed facts" that the subpoena was not prepared by or for the College, nor did the College use, receive, possess, or control it. In the College's view, section 7(2) merely provides that "public records" do not

cease being "public records" simply because a public body has given them to a contractor that is performing a governmental function.

¶ 35 Admittedly, the College's argument finds some support in a recent First District opinion. In *Better Government Ass'n v. Illinois High School Ass'n*, 2016 IL App (1st) 151356, *appeal allowed*, No. 121124 (Ill. Sept. 28, 2016), the Better Government Association (BGA) issued FOIA requests to Consolidated High School District 230 (District 230) and the Illinois High School Association (IHSA), which is a private not-for-profit corporation that sponsors high school athletic competitions within Illinois. *Id.* ¶ 3. IHSA responded by stating that it was not subject to FOIA because it was a nonprofit charitable organization, and District 230 responded by stating that it did not possess any records that were responsive to the request. *Id.* BGA then filed a complaint seeking, among other relief, a declaration that IHSA performed a governmental function on behalf of its member schools. *Id.* ¶ 4. The circuit court granted District 230's motion to dismiss and held that section 7(2) did not apply because IHSA did not perform a governmental function. *Id.* ¶ 10.

¶ 36 On appeal, the First District affirmed, holding that the requested records were not "public records," which it stated was the "threshold requirement" for triggering section 7(2). "Reading the plain language of section 7(2), as we must, the threshold requirement is that the requested documents qualify as a 'public record.' " *Id.* ¶ 45. As such, the court looked to the definition of "public records" under FOIA and stated that "[t]he initial question, therefore, is whether the requested records pertained 'to the transaction of public business' and were 'prepared by or for, or having been or being used by, received by, in the possession of, or under the control of any public body.' " *Id.* (quoting 5 ILCS 140/2(c) (West 2014)). Reasoning that IHSA did not engage in public or governmental business, the court held that the requested records did not pertain to the transaction of public business, thus failing to satisfy the "threshold requirement" that the records were public records under FOIA.[1] *Id.* ¶ 46. In the First District's view, section 7(2) merely "extends a public body's obligation to provide access to public records in the possession of a third party." *Id.* ¶ 47. Finding that the records were not public records, the court did not further analyze the elements of section 7(2). *Id.* ¶ 48.

¶ 37 Respectfully, we believe that the First District misconstrued the statute when it stated that the requested records must independently satisfy the definition of "public records" under section 2(c) in order to trigger section 7(2). Simply put, such a reading of section 7(2) would contravene the basic rules of statutory interpretation and render section 7(2) superfluous. In construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). A court may consider the reason and necessity for the statute and the evils it was intended to remedy, and it must not construe the statute in a manner that would lead to consequences that are absurd, inconvenient, or unjust. *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 513-14 (1998). The statute should be read as a whole and interpreted "so that no term is rendered superfluous or meaningless." *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001).

¶ 38 In section 2(c), FOIA defines the term "public records" as:

---

[1]Parenthetically, we observe that the First District would have reached the same holding had it begun its analysis under section 7(2) by considering whether IHSA performed a governmental function on behalf of District 230, then answering that question in the negative.

"[A]ll records, reports, forms, writings, letters, memoranda, books, papers, maps, photographs, microfilms, cards, tapes, recordings, electronic data processing records, electronic communications, recorded information and all other documentary materials pertaining to the transaction of public business, regardless of physical form or characteristics, having been prepared by or for, or having been or being used by, received by, in the possession of, or under the control of any public body." 5 ILCS 140/2(c) (West 2014).

¶ 39    Under a plain reading of section 2(c), records that qualify as "public records" remain "public records" if they are transferred to a nonpublic body. Importantly, section 2(c) does not require that a public body have present possession or control of the records in order for them to be "public records" subject to FOIA. So long as the other elements of section 2(c) are met, the definition is satisfied where a public body formerly possessed or controlled the records, as evidenced by the inclusion of the phrase "*having been* *** in the possession of, or under the control of any public body.*" (Emphasis added.) *Id.*

¶ 40    Likewise, section 3(a) establishes that public bodies are obligated to provide the general public with access to all public records, as long as the records are not exempt. "Each public body shall make available to any person for inspection or copying all public records, except as otherwise provided in Sections 7 and 8.5 of [FOIA]." 5 ILCS 140/3(a) (West 2014). This obligation is similarly not limited to those public records that the public body has present possession or control of, for it applies to "*all* public records." (Emphasis added.) *Id.* Reading sections 2(c) and 3(a) in conjunction makes clear that a public body's obligation to provide access to public records is not limited to those public records that it has present possession or control of—as that obligation continues even if such records are transferred to a nonpublic body. Therefore, the First District's interpretation that section 7(2) merely extends a public body's obligation to provide access to public records in the possession of a third party would render section 7(2) superfluous—public bodies already have such an obligation under section 3(a).

¶ 41    If accepted, the First District's interpretation would also lead to absurd results in many instances. Under its reasoning, records that are in the possession of an entity that has contracted with a public body to perform a governmental function, and that directly relate to that governmental function, will not be subject to FOIA unless they were first "prepared by," "prepared for," "used by," "received by," "possessed by," or "controlled by" the public body. By virtue of having entered into a contract delegating the performance of a governmental function to a third party, however, the public body rarely will have actually prepared, used, received, possessed, or controlled those records that "directly relate" to the governmental function. To impose these additional requirements, as the First District suggests, would have the unintended effect of shielding third-party records from disclosure in precisely those instances where section 7(2) was plainly meant to apply. Indeed, the First District seemed to recognize that its interpretation might be problematic, as it explicitly "recognize[d] that, in reading section 2(c) in conjunction with section 7(2), the requested documents need not be 'in the possession of, or under the control of [the] public body,' *** so long as the other elements of section 7(2) are satisfied." *Better Government Ass'n*, 2016 IL App (1st) 151356, ¶ 45. While we agree with the First District on this point, we submit that the records also need not satisfy the remaining elements of section 2(c) in order for section 7(2) to apply.

¶ 42    The language and purpose of section 7(2) make clear that a record that is possessed by a party under contract with a public body to perform a governmental function, and that directly relates to that governmental function, "shall be considered a public record of the public body," so long as it is not exempt. 5 ILCS 140/7(2) (West 2014). In essence, where each of the elements of section 7(2) is satisfied, certain third-party records are recast as public records of the public body for purposes of FOIA. This view avoids rendering section 7(2) superfluous, avoids absurd results, and is consistent with FOIA's stated purpose of providing "full and complete information regarding the affairs of government." 5 ILCS 140/1 (West 2014). Accordingly, we reject the College's argument that the circuit court erred in declining to address whether the federal grand jury subpoena was a public record of the College, independent of its relationship with the Foundation.

¶ 43    We next address whether the Foundation performs a governmental function on behalf of the College within the meaning of section 7(2). At the outset, we note that FOIA does not define the term "governmental function." Quoting Black's Law Dictionary, the Tribune maintains that a governmental function is a "government agency's conduct that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is carried out for the benefit of the general public." Black's Law Dictionary 812 (10th ed. 2014). The Tribune then points to the Act, which authorizes community college districts to "accept gifts, grants or legacies from any source when made for community college purposes." 110 ILCS 805/3-39.1 (West 2014). Thus, the Tribune argues that the College has contracted out to the Foundation its statutory authority under the Act to solicit, accept, and manage all of the College's private donations such that the Foundation performs a governmental function.

¶ 44    Relying on comments the First District made in *Better Government Ass'n*, defendants interpret the term "governmental function" markedly narrower. The Foundation argues that a governmental function is any act that can be performed only by exercising governmental power. In its briefs, the Foundation notes that powers that belong only to the State include the power to tax, eminent domain, and the police power. At oral argument, however, the Foundation agreed that if the College performed those same acts that the Foundation performed, the College would be performing a governmental function. The College seems to advocate for a number of different definitions. First, it argues that governmental functions are tasks that the government must perform to deliver the benefits in which citizens have a protectable property or liberty interest. It also argues that a governmental function is any activity needed to provide citizens with the benefits that the government is specifically fit to provide. Looking beyond the variations of what defendants contend is a governmental function, they both interpret *Better Government Ass'n* as rejecting the idea that it is any act that a public body merely *could* perform. They largely base this view on comments the court made in a concluding paragraph, wherein it stated that "although a public body *could* perform the same functions of IHSA ***, [it] does not perform public, governmental functions in this case." (Emphasis in original.) *Better Government Ass'n*, 2016 IL App (1st) 151356, ¶ 28. In essence, defendants maintain that the inverse of this statement must also be true—that a "governmental function" is any act that a *private* entity could *not* do.

¶ 45    Defendants' interpretation of section 7(2) has no basis in FOIA and, if accepted, would impermissibly narrow it. As the Tribune correctly points out, accepting defendants' view would allow public bodies to shield records from public scrutiny simply by delegating to third parties those responsibilities that do not involve the exercise of exclusive governmental

powers. Importantly, not even the College's own operations would qualify as a governmental function under the rule advocated by defendants. The State is not mandated to provide higher education to residents, nor is higher education provided exclusively by public bodies. Moreover, much governmental activity occurs without exercising governmental powers. Nevertheless, FOIA applies to all "public bodies" as that term is defined in section 2(c), regardless of whether they perform exclusive state functions. We thus reject defendants' overly narrow view of what "a governmental function" is under FOIA.

¶ 46    Defendants' arguments notwithstanding, we also note that *Better Government Ass'n* does not actually define the term "governmental function," nor does it provide a roadmap for analyzing section 7(2). This is underscored by the court's statement that it "need not further analyze the elements of section 7(2)." *Id.* ¶ 48. Though the First District concluded that IHSA did not perform a governmental function, it did so by analyzing factors pertinent to the relationship between the public body and the private entity in that particular case. For instance, the First District noted that courts do not recognize a property or liberty interest in playing interscholastic sports, that participation in athletics and IHSA was voluntary, that individual member schools operated their own teams, and that some interscholastic athletic events were held independent of IHSA. *Id.* ¶¶ 26-27. While these factors were relevant in evaluating whether IHSA performed a governmental function, they are of limited guidance here due to the nature of the relationship that the Foundation enjoys with the College, as compared to that of IHSA and District 230.

¶ 47    The Tribune invites us to define "governmental function" as any "conduct that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is carried out for the benefit of the general public." We believe that even the Tribune's proffered definition is too narrow, as it suffers from the same infirmities as those for which defendants advocate. Certainly not all governmental activity is done for the benefit of the *general* public. In the instant matter, for example, one could reasonably argue that the Foundation's support of the College benefits only its students and faculty rather than the public generally. To accept the Tribune's proposed definition would provide a means by which public bodies could conceal their records by contracting with third parties to perform those tasks that benefit less than the general public, in contravention of the State's public policy favoring disclosure. "[T]he people of this State have a right to full disclosure of information relating to the decisions, policies, procedures, rules, standards, and other aspects of government activity that affect the conduct of government and the lives of any or all the people." 5 ILCS 140/1 (West 2014).

¶ 48    Thus, we are hesitant to adopt a sweeping pronouncement of black letter law in this case, because it might prove to be insufficiently flexible to account for the myriad of governmental entities to which FOIA applies, to say nothing of the individualized governmental functions they each perform. Rather, we believe that such analysis must be subject to a fact-specific inquiry with an eye toward the particular public body's role and responsibilities and keeping in mind the specific act that it has contracted a third party to perform on its behalf. In this respect, we note that courts in other states have explored this issue under similar statutory frameworks. See *SWB Yankees LLC v. Wintermantel*, 45 A.3d 1029, 1042 (Pa. 2012) (holding that an activity performed by an independent contractor must involve "the delegation of some non-ancillary undertaking of government," rather than the entry of a routine service agreement, in order to be a governmental function); *Gannon v. Board of Regents*, 692 N.W.2d

31, 40 (Iowa 2005) (holding that to qualify as a function of a government body, the activity at issue need only advance the statutory objects of the institution).

¶ 49    Here, we agree with the Tribune that the Foundation is performing a governmental function on behalf of the College by way of the MOU. Defendants take great pains to describe the Foundation's activities as merely engaging in private fundraising to benefit a charitable cause. While we agree that the Foundation supports the College and is active in raising money for its benefit, it is apparent to us that the Foundation's activities on behalf of the College encompass far more than just charitable fundraising.

¶ 50    Prior to the MOU, individual College departments engaged in their own fundraising. Not long after the MOU, separate fundraising efforts by the College's individual departments ceased, and all private fundraising efforts were centralized in the Foundation. Under the MOU, the Foundation serves "as the primary depository of private donations on behalf of the College." Thus, the Foundation holds and allocates all private donations—even those that it did not solicit—and maintains records of all donations and pledges thereof. When an individual contacts the College seeking to make a donation, the College directs the individual to make the donation to the Foundation; the College will not accept it. All private donations are therefore routed through the Foundation, regardless of origin. The Foundation and the College also closely coordinate fundraising priorities, donor targets, and other affairs that usually would be handled by a public college's development office. The Foundation's strategic private-fundraising efforts are then integrated and coordinated with the College's goals and objectives. The College has no private-fundraising operation of its own, nor does it maintain a separate endowment—ostensibly because the Foundation handles all of these tasks exclusively, pursuant to contract. If the Foundation did not undertake these responsibilities, the College would necessarily do so itself, as it had done prior to the MOU. For all of these reasons, the Foundation is plainly performing a governmental function on behalf of the College.

¶ 51    Though not determinative in this case, we also note that this result is consistent with the holdings of courts in other states that have examined whether a foundation, carrying out fundraising specifically on behalf of a public university, performs a governmental function under similar open-records laws. See *East Stroudsburg University Foundation v. Office of Open Records*, 995 A.2d 496, 505 (Pa. Commw. Ct. 2010); *Gannon v. Board of Regents*, 692 N.W.2d 31-32 (Iowa 2005).

¶ 52    Defendants warn that applying section 7(2) to the Foundation would impermissibly expand the reach of FOIA to parent-teacher associations, booster clubs, and other volunteer organizations that fundraise to support schools. This argument is without merit, as the Foundation differs from such organizations. Those organizations are often run by volunteers, are not under contract to manage a school's entire endowment, and are not staffed by public employees who receive state health and retirement benefits. We likewise reject the College's argument that the application of section 7(2) to the Foundation puts the privacy rights of charities and philanthropists at risk. As the circuit court correctly noted in its ruling, FOIA contains numerous exemptions that, if applicable, would safeguard those interests. For example, section 7(1)(b) specifically exempts "[p]rivate information, unless disclosure is required by another provision of [FOIA], a State or federal law[,] or a court order." 5 ILCS 140/7(1)(b) (West 2014). Similarly, section 7(1)(c) exempts "[p]ersonal information contained within public records, the disclosure of which would constitute a clearly

- 12 -

unwarranted invasion of personal privacy, unless the disclosure is consented to in writing by the individual subjects of the information." 5 ILCS 140/7(1)(c) (West 2014).

¶ 53 Further, in order for relief to be granted under section 7(2), a record must "directly relate" to the governmental function performed on behalf of a public body. 5 ILCS 140/7(2) (West 2014). This requirement makes clear the legislature's intention that the general public may not access all of a third party's records merely because it has contracted with a public body to perform a governmental function. FOIA is not concerned with private affairs. *City of Champaign v. Madigan*, 2013 IL App (4th) 120662, ¶ 31. "[T]he fact that [a] private company's acts may be connected with a governmental function [does not] create a public body where none existed before." *Rockford Newspapers, Inc.*, 64 Ill. App. 3d at 97.

¶ 54 In granting summary judgment in favor of the Tribune, the circuit court specifically found that the federal grand jury subpoena "directly relates to the [Foundation's] governmental function pursuant to 5 ILCS 140/7(2)." In contesting this finding, the Foundation advances only a circular argument—that the subpoena does not "directly relate" to a governmental function because the Foundation's function is nongovernmental. The College does not address whether the subpoena "directly relates" to a governmental function, choosing instead to challenge the circuit court's finding that the Foundation performs a governmental function in the first place.

¶ 55 In the proceedings below, as well as on appeal, neither defendant argued that the federal grand jury subpoena concerned anything other than activities or documents directly relating to the Foundation's private-development duties that it performs on behalf of the College. Similarly, neither defendant has argued on appeal that any FOIA exemption applies,[2] nor did either defendant ask the circuit court to conduct an *in camera* review of the document, as contemplated under section 11(f) (5 ILCS 140/11(f) (West 2014)). As defendants have failed to argue that the federal grand jury subpoena does not "directly relate" to the Foundation's private-development activities that it performs on behalf of the College, they have forfeited this argument. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). In the absence of arguments that might have been raised but were not, we affirm the circuit court's finding that the subpoena "directly relates" to the Foundation's governmental function.

¶ 56 Next, the College argues that the summary judgment order should be reversed because the Tribune's claims against the College became moot when it produced all of the responsive records that it had in its possession—including the Du Page grand jury subpoena and all nonexempt leadership-cultivation documents. According to the College, it is powerless to produce the federal grand jury subpoena because it does not possess it, nor can it compel the Foundation to produce it. Thus, it argues, the favorable resolution of the Tribune's claims against the College would have no practical effect on the controversy.

¶ 57 The College fundamentally misunderstands section 7(2). Where all the elements are satisfied, section 7(2) plainly provides that the record at issue "shall be considered a public record of the public body, for purposes of [FOIA]." 5 ILCS 140/7(2) (West 2014). Therefore, even though the public body might not physically possess records sought in a FOIA request,

---

[2]Although no party raises the issue here, we note that there is no wholesale prohibition on disclosing federal grand jury subpoenas under FOIA. See *Better Government Ass'n v. Blagojevich*, 386 Ill. App. 3d 808, 817 (2008) (holding that Governor was required to disclose federal grand jury subpoenas under FOIA).

under section 7(2) it must attempt to obtain them if they directly relate to a governmental function that the public body has delegated to a third party pursuant to a contract. We recognize that a public body might face difficulty in obtaining such records from a third-party contractor that performs a governmental function on its behalf. For example, the public body and the third-party contractor might in good faith disagree on which documents "directly relate" to the governmental function. We need not address such a circumstance here, however, as the College took no effort to obtain the requested record from the Foundation. Rather, the College's effort to produce it was limited to a search of its own records. Where section 7(2) applies, the public body is a necessary party to any suit for injunctive or declaratory relief under FOIA, and a requester's claims against it do not become moot simply because a third party rather than the public body, has "public records" under section 7(2).

¶ 58    Here, we reject the College's contention that it is powerless to obtain the subpoena, as doing so would have required minimal effort due to the extreme degree to which the College is entwined with the Foundation, as outlined above. We note that this is not a circumstance where the requested record does not exist or was lost or destroyed. See *Workmann v. Illinois State Board of Education*, 229 Ill. App. 3d 459, 464 (1992) (holding that FOIA requester was not entitled to attorney fees where public body failed to turn over public records that it had lost); see also *Safecard Services, Inc. v. Securities & Exchange Comm'n*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (holding that, under federal FOIA, the Securities and Exchange Commission was not required to recreate documents that were mistakenly discarded by its contracted cleaning service).

¶ 59    In her discovery deposition, Kuhn testified that she was served with the subpoena while she was in the College's resource development office on April 13, 2015. She went into her office, read it, and called her supervisor, Brod. After Brod provided her with instructions, Kuhn gave the subpoena to an administrative assistant, who also worked for both the College and the Foundation. The assistant then drove the subpoena to the office of the Foundation's outside counsel, where it has remained since before the inception of this litigation. Under these circumstances, it is clear to us that the College does not possess the federal grand jury subpoena of its own accord, and it cannot now claim that it is powerless to disclose it.

¶ 60    Finally, defendants contend that the circuit court erred in allowing the Tribune to voluntarily withdraw its fee petition without prejudice. Eight days after the circuit court granted its motion for summary judgment, the Tribune filed a petition for attorney fees under section 11(i) of FOIA. 5 ILCS 140/11(i) (West 2014). Subsequently, defendants filed notices of appeal, objections to the Tribune's fee petition, and a series of additional motions. In this court, defendants each filed a motion to stay appellate briefing pending the resolution of the fee petition in the circuit court. On July 18, 2016, the circuit court allowed the Tribune to voluntarily withdraw its fee petition without prejudice, in order to defer the issue of attorney fees until after the appeal. The order indicated that the circuit court reserved jurisdiction to consider a renewed fee petition following the resolution of the appeal and that the ruling was made without prejudice to defendants contesting the circuit court's jurisdiction to consider a renewed fee petition. In this court, defendants were then granted leave to amend their notices of appeal to include the order of July 18, 2016.

¶ 61    According to defendants, the Tribune's decision to voluntarily withdraw its fee petition means that the circuit court will lack jurisdiction to consider any fee petition that the Tribune

might file in the future because the petition would necessarily be filed outside of the 30-day window for filing postjudgment motions. The Foundation urges us to "find that the trial court lacks subject matter jurisdiction to consider a second fee petition that the Tribune may file at a later date." The College similarly argues that, "[b]ecause the Circuit Court cannot have indefinite jurisdiction over the Tribune's fee petition, it erred when it entered the July 18 order."

¶ 62    The Tribune maintains that the circuit court will have jurisdiction to consider a subsequent fee petition by operation of Illinois Supreme Court Rule 369(b) (eff. July 1, 1982), which provides that, when a mandate is filed with the circuit court after an affirmance, "enforcement of the judgment may be had and other proceedings may be conducted as if no appeal had been taken." The Foundation does not respond to this argument. The College takes the position that Rule 369(b) does not apply because it concerns mechanisms only by which the circuit court regains jurisdiction over a case when jurisdiction has been lost because of an appeal. Here, the College argues that the circuit court lost jurisdiction over the Tribune's fee petition not because the case was appealed, but because the Tribune voluntarily withdrew the petition beyond the time for filing.

¶ 63    We reject defendants' arguments and hold that the circuit court will have jurisdiction to consider a subsequent fee petition that is timely filed. Rule 369(b) provides that, "[w]hen the reviewing court dismisses the appeal or affirms the judgment and the mandate is filed with the circuit court, enforcement of the judgment may be had and other proceedings may be conducted as if no appeal had been taken." *Id.* The mandate of a court of review is the transmittal of the judgment of that court to the circuit court, and it revests the circuit court with jurisdiction. *PSL Realty Co. v. Granite Investment Co.*, 86 Ill. 2d 291, 304 (1981). After the mandate is issued, "the trial court is revested with jurisdiction where the appellate court affirms a judgment or dismisses the appeal." *Glens of Hanover Condominium Ass'n v. Carbide*, 2014 IL App (2d) 130432, ¶ 4.

¶ 64    Here, it is of no consequence that defendants' original notices of appeal became effective only because the Tribune voluntarily withdrew its fee petition. The salient points are that the case was properly appealed and that we are affirming the judgment of the circuit court. Because we affirm, the circuit court will be revested with jurisdiction to consider other proceedings upon the issuance of our mandate, including a timely filed fee petition. See *Coldwell Banker Havens, Inc. v. Renfro*, 288 Ill. App. 3d 442, 447 (1997) (holding that a petition for attorney fees is an "other proceeding" under Rule 369(b)). Thus, the Tribune is free to pursue a timely filed fee petition in the circuit court if it chooses. However, we express no opinion as to whether the Tribune's election to withdraw its original fee petition results in the forfeiture of those fees prayed for therein. To the extent that we would have otherwise been inclined to address this issue as one likely to arise, defendants did not sufficiently develop it. They are free to do so in the circuit court, however, upon the issuance of our mandate.

¶ 65                                    III. CONCLUSION

¶ 66    For the above-stated reasons, we affirm the judgment of the circuit court of Du Page County, dismiss the Tribune's cross-appeal, and remand the cause for further proceedings consistent with this opinion.

¶ 67         Affirmed; cross-appeal dismissed; cause remanded.