2019 IL App (1st) 190926-U

THIRD DIVISION
December 31, 2019

No. 1-19-0926

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| OWNERS INSURANCE COMPANY, | ) | |
| | ) | Appeal from the |
|       Plaintiff/Counterdefendant-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
|   v. | ) | |
| | ) | 17 CH 12850 |
| PRECISION PAINTING AND DECORATING | ) | |
| CORPORATION, | ) | Honorable |
| | ) | Pamela McLean Meyerson, |
|       Defendant/Counterplaintiff-Appellant. | ) | Judge Presiding |
| | ) | |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversed in part, vacated in part, and remanded. Insurer had duty to defend insured in underlying suit.

¶ 2    Defendant, Precision Painting and Decorating Corporation (Precision), was sued for allegedly contaminating the interior of a house with lead paint dust. Precision tendered defense of that lawsuit to its insurer, Owners Insurance Company (Owners). Owners denied coverage and sued for a declaration that it had no duty to defend Precision. The trial court agreed with Owners and entered judgment in its favor.

¶ 3    We hold that Owners owed a duty to defend Precision in the underlying lawsuit.

¶ 4 BACKGROUND

¶ 5 We begin with the background of the underlying lawsuit, filed by Khalil and Michaela Karim against Precision, the painting company they hired to paint the exterior of their home. We take our facts from the pleading that all agree is the operative pleading in this case, the second amended complaint, which both parties call the "Underlying Complaint," and thus so will we.

¶ 6 I. Underlying Complaint

¶ 7 The Karims own a home designed by Frank Lloyd Wright that was built in the beginning of the twentieth century. Portions of the home were painted with lead-based paint. Specifically, "all the exterior paint wood features were identified to [Precision] in contract discussions as having been painted with lead-based paint." Unlike the exterior, "the interior and door systems are not painted with lead based paint." Prior to Precision's commencement of work, there were "no visible paint chips or dust on the interior or exterior of the property."

¶ 8 The written contract between the Karims and Precision required that "[a]ll preparation will be done according to EPA regulations assuming there is lead-based paint present." These regulations required Precision to take special care to contain lead dust while working on the Karims' home. The Underlying Complaint alleges that, during the course of its work, Precision wholly failed to abide by these safety requirements, including (1) using the "Festool System" without the use of a shroud or HEPA vacuum, as required; (2) using the prohibited "dry scraping" method of paint removal; and (3) failing to use adequate containment barriers, etc. The Underlying Complaint further alleges that Precision "routinely failed to adequately clean up lead-based paint dust and debris on and around the site at the end of a workday."

¶ 9 In one "egregious instance," Precision left a plastic covering over an exterior porch fan. The plastic was "covered with dry scraped lead-based paint dust and debris." Precision failed to

clean the debris in a timely fashion and, as a result, "the winds blew dust and debris over the porch area and nearby groundcover such that at time it appeared to be 'snowing' lead-based paint dust and debris." Because of Precision's conduct, the Karims claimed that lead-based paint dust and debris contaminated their property. After numerous discussions between the Karims and Precision, Precision left the work site and never returned.

¶ 10    Testing by the Karims' lead inspection expert showed that "the interior dust samples show 16 of 20 samples exceed the limits for lead in dust set by the Illinois Department of Public Health. As to the land, "one of the four exterior sample tests showed lead in soil that exceeded the Illinois Department of Health limits for lead in soil." As a result of the contamination, the Karims were required to pay for contamination clean-up, "clearance samples," and temporary housing costs.

¶ 11    The Underlying Complaint sounds in negligence (count I), consumer fraud (count II), and breach of contract (count III).

¶ 12                              II. Precision's Insurance Policy

¶ 13    At all relevant times, Precision was insured by Owners. The insurance policy between Precision and Owners (the Policy) provides, in the Commercial General Liability (CGL) Coverage Form, that Owners will cover Precision's liability for "bodily injury" or "property damage" but only if they are caused by an "occurrence."

¶ 14    The word "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 15    The phrase "property damage" is defined as:

"a.      Physical injury to tangible property, including all resulting loss of use of that

property. All such loss of use shall be deemed to occur at the time of the physical injury

at the time of the physical injury that caused it; or

b.      Loss of use of tangible property that is not physically injured. All such loss shall

be deemed to occur at the time of the **"occurrence"** that caused it." (Emphasis in

original).

¶ 16    "Bodily injury" is defined as "bodily injury, bodily sickness or bodily disease sustained

by a person, including death resulting from any of these at any time."

¶ 17                              III. Declaratory Judgment Action

¶ 18    Precision tendered defense of the underlying lawsuit to Owners. In response, Owners

filed a Verified Complaint for Declaratory Judgment—the case before us—seeking a declaration

that it did not owe a duty to defend Owners "because no 'property damage' or 'bodily injury

[*sic*] caused by an 'occurrence' is alleged in the Underlying Complaint." Specifically, because

"[u]nder Illinois law, a damages [*sic*] resulting from the insured's breach of the terms of an

express written contract are not recoverable under Owner's Policy."

¶ 19    Precision counterclaimed. Count I was for breach of contract, alleging that Owners had a

duty to defend the underlying lawsuit, it breached that contractual duty by failing to defend, and

Precision suffered damages in the form of legal fees incurred in the defense of that underlying

suit. Count II sought a declaration that Owners owed a duty to *indemnify* Precision for any

liability incurred as a result of the underlying lawsuit.

¶ 20    The parties filed cross-motions for judgment on the pleadings. Specifically, Owners

moved for judgment on the pleadings on its complaint, arguing that an "occurrence" was not

alleged in the Underlying Complaint, and thus no duty to defend existed.

¶ 21    Precision cross-moved for judgment on the pleadings on Owners' declaratory judgment complaint and on count I of its counterclaim, the breach-of-contract count. (It was obviously premature to seek relief on the question of indemnification, the subject of count II.)

¶ 22    The circuit court granted Owners' motion, finding no duty to defend, and entered a "final order disposing of all matters herein."

¶ 23    Precision appeals the grant of Owners' motion and the denial of its motion.

¶ 24                                JURISDICTION

¶ 25    We begin with a brief discussion of why we have jurisdiction over this matter. We must always consider appellate jurisdiction, even if the parties don't challenge it. *Lakeshore Center Holdings, LLC v. LHC Loan, LLC*, 2019 IL App (1st) 180576, ¶ 9.

¶ 26    The pleadings below consisted of Owners' declaratory judgment complaint and Precision's two-count counterclaim. Owners moved for judgment on the pleadings on its complaint. Precision moved for judgment on the pleadings as to Owners' complaint and as to count I of its counterclaim. That leaves count II of Precision's counterclaim, seeking a declaration that Owners has a duty to *indemnify* Precision for any liability incurred as a result of the underlying lawsuit. Nobody filed a motion of any kind directed against count II.

¶ 27    Which might lead the careful lawyer to wonder about appellate jurisdiction, as a final judgment that does not dispose of all claims pending in the trial court is not appealable, absent language under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there is no just reason to delay an appeal. See *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 502-03 (1997) ("Without a Rule 304(a) finding, a final order disposing of fewer than all of the claims in an action is not instantly appealable. Such an order does not become appealable until all of the claims in the multiclaim litigation have been resolved.").

¶ 28    But the trial court's written order made clear that it "dispos[ed] of all matters," and properly so. The duty to defend is broader than the duty to indemnify. *Crum and Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393-94 (1993). So if Owners had no duty to defend Precision, as the trial court found, then it obviously had no duty to indemnify Precision, either. The trial court's finding of no duty to defend left it with the inevitable conclusion that count II of Precision's counterclaim failed as a matter of law, and thus the trial court's ruling had the effect of a *sua sponte* dismissal of count II. See *Bilski v. Walker*, 392 Ill. App. 3d 153, 156 (2009) (trial court has inherent authority to dismiss action *sua sponte*).

¶ 29    Which means that all of the claims in the trial court were fully and finally resolved in the trial court's judgment order, resulting in a final and appealable judgment subject to appellate review under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994); see *Dubina*, 178 Ill. 2d at 503.

¶ 30    That brings us to a second issue. Precision appeals not only the grant of judgment on the pleadings in favor of Owners but also the denial of Precision's cross-motion. Ordinarily, the denial of a dispositive motion (say, for summary judgment or judgment on the pleadings) is not considered "final" and thus not appealable. *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 119; *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange*, 2018 IL App (1st) 171316, ¶ 65. But an exception exists if the parties have filed cross-motions, one is granted and the other denied, and that ruling disposes of all issues in this case. *Clark*, 2011 IL 108656, ¶ 119; *Platinum Partners*, 2018 IL App (1st) 171316, ¶ 66.

¶ 31    That describes this case. The parties filed cross-motions for judgment on the pleadings, the trial court granted one and denied the other, and as we just explained above, the court's ruling disposed of all matters in this litigation. So jurisdiction is proper.

¶ 32    Having confirmed our jurisdiction, we turn to the merits.

¶ 33                                    ANALYSIS

¶ 34     Judgment on the pleadings is like summary judgment limited to the pleadings. *Pekin Insurance Company v. Wilson*, 237 Ill. 2d 446, 455 (2010). Judgment on the pleadings will be granted only if the pleadings do not reveal a genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id*. Where the parties file cross-motion for judgment on the pleadings, the parties " 'agree that only a question of law is involved and invite the court to decide the issues based on the record.' " *Illinois State Bar Association Mutual Insurance Co. v. McNabola Law Group, P.C.*, 2019 IL App (1st) 182386, ¶ 12 (quoting *Illinois Emcasco Insurance Co. v. Tufano*, 2016 IL App (1st) 151196, ¶ 17). Our review is *de novo*. *Id*.

¶ 35     In determining an insurer's duty to defend an insured in an underlying suit, we compare the allegations in the underlying suit with the relevant policy language. *Pekin Insurance Co. v. Centex Homes*, 2017 IL App (1st) 153601, ¶ 34. We liberally construe the underlying complaint and policy in favor of the insured. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991). The threshold that an underlying complaint must meet to trigger the duty to defend is low. *State Farm Fire and Casualty Company v. Tillerson*, 334 Ill. App. 3d 404, 408 (2002); *Bituminous Casualty Co. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956, 960 (1991) ("minimal"). An insurer must defend an action "unless it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *Wilkin*, 144 Ill. 2d at 73.

¶ 36     We begin with a general proposition that will resonate throughout this analysis. In a commonly quoted passage, our supreme court has stated that

           " '[C]omprehensive general liability policies * * * are intended to protect the

           insured from liability for injury or damage to the person or property of others; they are

not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.' " *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 314 (2001) (quoting *Qualls v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 831, 833-34 (1984)).

¶ 37    We have often emphasized the distinction above, the difference between a CGL policy and a performance bond, in the case law discussing the meanings of "occurrence" and "property damage" in CGL policies. See, *e.g.*, *Certain Underwriters at Lloyd's London v. Metropolitan Builders Inc.,* 2019 IL App (1st) 190517, ¶¶ 35-39; *Stoneridge Development Co., Inc. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 752 (2008); *Viking Construction Management v. Liberty Mutual Insurance Co.*, 358 Ill. App. 3d 34, 55 (2005); *State Farm Fire and Casualty Insurance Co. v. Tillerson*, 334 Ill. App. 3d 404, 410 (2002); *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 709 (1996).

¶ 38    As we will see below, that language from *Travelers* has significantly impacted the analysis of both our interpretations of "occurrence" and "property damage" in the voluminous body of case law considering these definitions in CGL policies.

¶ 39                                I. "Occurrence"

¶ 40    The trial court ruled that the Underlying Complaint did not allege an "occurrence." Recall that the Policy defines occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." And recall generally the allegations in the Underlying Complaint that Precision, hired to paint the exterior of the Karims' house in compliance with EPA regulations governing the removal of lead-based paint, failed to properly

contain the lead, resulting in contamination of both the interior of the Karims' home as well as the ground and soil on their property.

¶ 41     The trial court found that no "accident" or "occurrence" was alleged, because the Karims' contract with Precision "specifically contemplated that there would be lead in this paint" and provided for various EPA-required precautions Precision would take. Precision's failure to properly contain the lead, resulting in contamination, was thus not an "accident," which the trial court viewed as "something that was unforeseen or untoward or disastrous." Instead, it was just a rather garden-variety example of a party promising to do something in a contract and not doing it—the resulting breach being entirely foreseeable.

¶ 42     In a vacuum, it's hard to argue with the trial court's logic. As the trial court noted, we have defined the word "accident" in CGL policies to mean " 'an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflicting or unfortunate character.' " *Stoneridge*, 382 Ill. App. 3d at 749 (quoting *Westfield National Insurance Co. v. Continental Community Bank & Trust Co.*, 346 Ill. App. 3d 113, 117 (2003)); see also *id*. at 749-50 (collecting cases). And what more foreseeable a breach could there possibly be, in a contract that included the removal of lead-based paint and required compliance with EPA standards while doing so, than the failure to contain the lead-based particles, resulting in contamination?

¶ 43     Still, whatever the merits of the trial court's reasoning, an enormous body of case law considering the definition of "occurrence" in CGL policies has resulted in a different rule, which leads us to a different result. Instead of focusing on the foreseeability of the event itself (the release of lead-based particles), or even generally the damages (lead contamination), the case law instructs us to focus on what, specifically, was damaged, and whether the remediation of that

damage fits within the general purpose of a CGL policy. See *Metropolitan*, 2019 IL App (1st) 190517, ¶ 46 (case law "has focused at least as much on the purposes of CGL policies as it has on textual interpretation and application.").

¶ 44    Thus, recalling our supreme court's statement that CGL policies "are not intended to pay the costs associated with repairing or replacing the insured's defective work and products" (*Travelers*, 197 Ill. 2d at 314), we have repeatedly said that a CGL policy does not cover the costs directly associated with faulty workmanship. *Acuity Insurance Co. v. 950 West Huron Condominium Ass'n*, 2019 IL App (1st) 180743, ¶ 26 (CGL policy " 'does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident.' ") (quoting *Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 289 Ill. App. 3d 819, 823 (1997), in turn quoting *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 498 (1985)).

¶ 45    In other words, " 'there is no occurrence when a [contractor's] defective workmanship necessitates removing and repairing work.' " *Milwaukee Mutual Insurance Co. v. J.P. Larsen*, 2011 IL App (1st) 101316, ¶ 26 (quoting *Viking Construction*, 358 Ill. App. 3d at 42). We consider repair or replacement to be the " 'natural and ordinary consequence of faulty workmanship,' " not an "accident." *Acuity*, 2019 IL App (1st) 180743, ¶ 28 (quoting *Tillerson*, 334 Ill. App. 3d at 409); *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 705 (1996); *Indiana Insurance Co. v. Hydra Corp.*, 245 Ill. App. 3d 926, 930 (1993) ("The natural and ordinary consequences of an act do not constitute an accident.").

¶ 46    So if improperly-sealed windows require repair or replacement, or a defectively-constructed brick wall requires rebuilding, those damages are not deemed to be the result of an "accident" or "occurrence." See *J.P. Larsen*, 2011 IL App (1st) 101316, ¶¶ 27-28; *Viking Construction*, 358 Ill. App. 3d at 42, 55. They are, in essence, the mere cost of fixing the

contractor's mistake, and nothing more. Nor would the cost of repairing an unstable foundation on which a house was built, or the cost of fixing the cracks that resulted from the defective foundation, be deemed the result of an "accident" or "occurrence;" instead, they are the natural and ordinary consequence of faulty workmanship. See *Stoneridge*, 382 Ill. App. 3d at 753.

¶ 47    And that principle extends to damage to any other part of the project for which the contractor has responsibility, as it remains part of the contractor's work product. So if leaky windows required more than repair or replacement, but also resulted in water leaking down into other parts of the building *that were still within the scope of the contractor's work*, the water damage to those other areas would not be deemed to be the result of an "accident," either. See *Wil-Freds*, 277 Ill. App. 3d at 705. It would still be repair and replacement of the contractor's work product.

¶ 48    The flip side, however—the critical distinction here—is that "when the underlying lawsuit against the insured contractor alleges damages *beyond* repair and replacement, and *beyond* damage to other parts of the same project over which that contractor was responsible, those additional damages are deemed to be the result of an 'accident.' " (Emphasis in original.) *Metropolitan*, 2019 IL App (1st) 190517, ¶ 52; see also *Acuity*, 2019 IL App (1st) 180743, ¶ 29 ("we have repeatedly recognized that while a CGL policy will not insure a contractor for the cost of correcting construction defects, 'damage to something other than the project itself *does* constitute an 'occurrence' under a CGL policy.' ") (emphasis in original) (quoting *J.P. Larsen,* 2011 IL App (1st) 101316, ¶ 27)).

¶ 49    For a good example of this distinction, consider a case involving a contractor's defective installation of plumbing. Damages consisting of the repair and replacement of that plumbing are not deemed to have resulted from an "accident," but allegations of water damage to a

homeowner's furniture, antiques, and clothing *are* the result of an "accident" and thus an "occurrence," because that damage extended beyond the contractor's work product to personal property of the homeowner. See *Richard Marker*, 289 Ill. App. 3d at 823; *Metropolitan*, 2019 IL App (1st) 190517, ¶ 53. While the law deems repair and replacement of shoddy work to be foreseeable within the confines of a CGL policy, damages that go beyond repair and replacement, and beyond the contractor's work product, are not foreseeable.

¶ 50    With all of that said, there is no question that that the allegations of the Underlying Complaint constitute an "accident" and thus an "occurrence." Precision was hired to work on the exterior of the Karims' home. The "work product"—the scope of Precision's project—was the exterior of the house.

¶ 51    The Underlying Complaint alleges that Precision's negligence caused damage well beyond that. In great detail, the Karims alleged that the lead dust infiltrated the *interior* of their home, as well as the surrounding land within the Karims' property. The Karims are not claiming that the exterior walls were painted defectively and must be repaired or repainted; they are saying other parts of their property—the interior and surrounding land—were damaged. Under our long-settled case law, those claims are sufficient to allege an "accident" and thus an "occurrence" under the Policy.

¶ 52    Owners, as did the trial court, relies on *Tillerson*, 334 Ill. App. 3d at 408, where the underlying complaint alleged that the contractor built a new addition to a homeowner's property over a cistern that led to an unstable foundation under the room. The underlying complaint, sounding in contract claims only, sought damages for either repair/replacement or diminution in value to the property. *Id*. We held that no "occurrence" was alleged. *Id*.

¶ 53    That ruling was entirely consistent with our disposition. The damage was limited to remediating the contractor's mistake. It did not involve damage to any other person or property beyond the contractor's work product. Thus, that underlying complaint did not allege an "accident" or "occurrence" within the CGL policy.

¶ 54    We acknowledge that *Tillerson*'s analysis of the "occurrence" definition did not look much like ours. The court there did not discuss the differences in the types of damages alleged or the purpose or scope of a CGL policy. It did discuss those very things, however, in the next section concerning the definition of "property damage." See *id*. at 409-410.

¶ 55    That leads us to a point we mentioned earlier, and which we recently made in *Metropolitan*, 2019 IL App (1st) 190517, ¶ 67, that there is "considerable overlap between the analyses of the definition of 'occurrence' and that of 'property damage' " in CGL policies. Although "occurrence" and "property damage" are obviously different phrases with different definitions, the "guiding principle in determining the definitions of both 'occurrence' and 'property damage' in CGL policies" has been the distinction between whether the damage was to other property beyond the scope of the contractor's work. *Id*. ¶ 23; see also *id*. ¶ 26 ("Indeed, in some cases, we have not even bothered to isolate the two definitions, instead considering them collectively as one phrase ('property damage caused by an occurrence') and determining whether the damages alleged against the contractor in the underlying lawsuit fit within or outside the purpose of CGL policies.").

¶ 56    An example of this is our recent decision in *Acuity*, 2019 IL App (1st) 180743, ¶¶ 29, 44, where we held that a CGL policy covered damage from faulty installation and caulking of doors and windows that led to water damage in other parts of the building, beyond the scope of the subcontractor's project. Our focus on the damages being beyond repair and replacement, and in

areas of the building beyond the scope of the subcontractor's work, guided our analysis in both our discussion of "occurrence" and "property damage." *Id*.

¶ 57     In any event, we find nothing in *Tillerson* that is inconsistent with our holding. The case law, *Tillerson* included, has consistently (i) denied coverage when the claimed damages were limited to repair and replacement (or compensation for diminution in value) of the contractor's work product and (ii) allowed coverage when the alleged damages went beyond the scope of the contractor's work. Here, the alleged damages obviously go beyond the exterior of the house and thus well beyond the scope of Precision's work. The Underlying Complaint alleges damages that resulted from an "occurrence."

¶ 58     In light of our holding, we need not reach Precision's other argument, a more streamlined path to victory. Precision says that, because "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and this case involves lead exposure, we can find an "occurrence" to have been alleged even if an "accident" was not. In other words, the long second phrase makes this an "occurrence" even if the first word, "accident," does not.

¶ 59     The trial court didn't buy that argument, reasoning that the definition merely meant to make clear that an "accident" could *include* harmful-exposure cases, but it didn't mean that every harmful-exposure was automatically an "accident." Resolution of that question would involve a discussion of our supreme court's decision in *Wilkin*, 144 Ill. 2d at 77. Since the case law very clearly settles our question in Precision's favor on the grounds stated above, we need not reach this question.

¶ 60     We hold that the Underlying Complaint alleged damages caused by an "occurrence." Owners was not entitled to judgment on the pleadings, at least not on this ground.

¶ 61                              II. Resolution of Remaining Questions

¶ 62    Now that we have held that the Underlying Complaint alleged an "occurrence," there is a question—among the parties, at least—as to what we should do next.

¶ 63    The issue of coverage here ultimately involves more than one question. Owners has a duty to defend Precision in the underlying lawsuit if and only if two different propositions are true: (1) the Underlying Complaint alleged "bodily injury" or "property damage;" and (2) the Underlying Complaint alleged that such injury or damage was the result of an "occurrence."

¶ 64    To *negate* coverage, Owners need only win one of these two arguments. Recognizing as much, Owners chose to focus in the trial court (and to some extent, on appeal) on the second question, involving the term "occurrence." And when the trial court agreed with Owners that no "occurrence" was alleged, the trial court had no reason to reach the other question, because the issue of coverage had been conclusively settled in favor of Owners.

¶ 65    But Precision obviously must prevail on both questions to *establish* coverage. And throughout the litigation in the trial court, it argued both questions—that the Underlying Complaint alleged both an (1) "occurrence" *and* (2) "bodily injury" and/or "property damage." Indeed, it could not possibly have asked for judgment in its favor on Owner's complaint, much less on count I of its counterclaim, without arguing both questions. And Precision is appealing all its losses in the trial court—not just the granting of Owners' motion but also the denial of its own motions for judgment on Owners' complaint and on count I of its counterclaim.

¶ 66    Given our ruling in favor of Precision on the question of "occurrence," the only way to fully review the trial court's denial of Precision's motion for judgment on the pleadings is to further determine whether either "property damage" or "bodily injury" was alleged in the Underlying Complaint. That question is just as much before us as the definition of "occurrence."

¶ 67    In its brief, however, Owners argues that we should only consider the "occurrence" question, as that was the only issue the trial court considered. To be sure, had we agreed with the trial court on the "occurrence" question, we would have stopped there, just like the trial court, having no need to venture further. But we have just indicated above that we respectfully part ways with the trial court and Owners; we have held that the Underlying Complaint did allege an "occurrence."

¶ 68    Should we stop there and remand the case? Nothing would prevent us from doing so. But it would make little sense. We would not be granting relief to either party, because the question of "bodily injury"/"property damage" would remain. We would remand the matter to the trial court to decide the second question and then, almost certainly, review a second appeal on that second question.

¶ 69    That would run against any notion of judicial economy. Nor would it be fair or reasonable. The interpretation of "bodily injury" or "property damage" is a pure question of law that was fully briefed below and here on appeal. Whether Owners chose to focus on it as a matter of strategy is beside the point; these legal questions have been front and center throughout this litigation. Delaying a complete resolution of this question would do no favor to the parties, and surely none to the busy chancery judge.

¶ 70    So we will move on to the second question of whether the Underlying Complaint adequately alleged "property damage" or "bodily injury."

¶ 71                              III. "Property Damage"

¶ 72    The Policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." Our supreme court has explained that

"to the average, ordinary person, tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in other material dimension. Conversely, to the average mind, tangible property does not experience 'physical' injury if that property suffers intangible damage, such as diminution in value as a result from the failure of a component." *Travelers*, 197 Ill. 2d at 301.

¶ 73    But beyond this definition, as noted above, just as they do when interpreting the word "occurrence," courts consider the overall purpose of CGL policies when construing the phrase "property damage" in those policies. See *Metropolitan*, 2019 IL App (1st) 190517, ¶ 59. For example, in a case we just discussed, *Tillerson*, 334 Ill. App. 3d at 409, we found that the damage to the house due to the unstable foundation was not "property damage," as the homeowners "merely [sought] either the repair or replacement of defective work or the diminishing value of their home," which we deemed "economic loss" only. *Id*. at 410; see also *Stoneridge*, 382 Ill. App. 3d at 753 (homeowner's suit against contractor, claiming that contractor's installation of unstable foundation led to cracks in home's walls, did not allege "property damage" under CGL policy, as complaint only alleged damages for repair/replacement or diminution in value of contractor's work product).

¶ 74    Likewise, the collapse of a middle school's wall, improperly constructed by a contractor, was not "property damage," because the damage was the purely economic cost of replacing the wall that CGL policies were not intended to cover. *Viking Construction*, 358 Ill. App. 3d at 55.

¶ 75    The other side of that coin, of course, is that allegations of damage to property other than the contractor's work product *do* constitute "property damage" under the CGL policy. See *Acuity*, 2019 IL App (1st) 180743, ¶¶ 29, 44 (finding that underlying complaint alleged both

"occurrence" and "property damage" for same reason—damage was to part of building that went beyond scope of subcontractor's work).

¶ 76    In finding that underlying allegations of negligent construction of a second-story structure over an existing garage was "property damage," the Seventh Circuit explicitly based its holding on the fact that the damage extended to the existing garage—that is, beyond the contractor's second-story work product. See *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146, 1148-49 (7th Cir. 1987) (under Illinois law, "[b]ecause [the owner's] complaint alleges damage to property *other than Bazzi's own work or product*, namely the structure of the existing garage, *** the [underlying complaint] states a claim for property damage that is potentially within the coverage of the [CGL] policy" (emphasis added)).

¶ 77    Thus, as with an "occurrence," the case law has long held that damage to property that extends beyond the work product of the contractor is "property damage" as defined in the CGL policy.

¶ 78    Here, as noted, there is no question that the Karims have alleged damage beyond the exterior of their home, to which Precision's work product was limited. The Underlying Complaint alleges damage to the interior of the home and its surrounding land. These allegations constituted "property damage" under the CGL policy.

¶ 79                                    IV. Effect of this Holding

¶ 80    As the Underlying Complaint adequately alleged "property damage" caused by an "occurrence," Owners owed Precision a duty to defend. Judgment on the pleadings in favor of Owners on its declaratory judgment complaint was error, as was the denial of Precision's cross-motion—at least insofar as it was directed against Owners' declaratory judgment complaint.

¶ 81    But there remains Precision's counterclaim. Count I sounded in breach of contract, the breach being a breach of the duty to defend Precision in the Karims' underlying lawsuit. Count I included a claim for damages for the legal fees and costs thus far incurred in the Karims' lawsuit. The trial court dismissed count I because it found no duty to defend, and that took the legs out from under count I. Our holding here to the contrary breathes new life into count I but does not fully resolve it by any means; there may be additional questions remaining on the issue of breach—we have no idea, nothing before us on that issue—and we obviously have nothing before us whatsoever on the question of damages.

¶ 82    And then there is count II of the counterclaim, which claims that Owners owes a duty to *indemnify* Precision. As earlier noted, the trial court's ruling disposed of this count—if there is no duty to defend, there is no duty to indemnify—and our holding here revives the possibility that Precision might prevail on that claim, too. But as with count I, our holding does not resolve count II; it merely gives it new life.

¶ 83    The proper course is to vacate the court's judgment insofar as it concerned Precision's counterclaim and remand to the circuit court for further proceedings consistent with our holding.

¶ 84                                    CONCLUSION

¶ 85    As to Owner's declaratory judgment complaint, the trial court's judgment is reversed. The cause is remanded for the entry of judgment on the pleadings in favor of Precision.

¶ 86    As to Precision's counterclaim, the trial court's judgment is vacated. The cause is remanded for further proceedings consistent with our ruling.

¶ 87    Reversed in part, vacated in part, and remanded.