# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Milwaukee Mutual Insurance Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316

---

| | |
|---|---|
| Appellate Court Caption | MILWAUKEE MUTUAL INSURANCE COMPANY, n/k/a Milwaukee Insurance Company, Plaintiff-Appellant, v. J.P. LARSEN, INC., Defendant-Appellee (Weather-Tite, Inc.; Board of Directors of the Prairie District Homes Tower Residences Condominium Association; 18th and Prairie II, LLC; Legacy Development Group VIII, LLC; William E. Warman; Warren Barr III; David Cuomo; William McNabola; General Investment Corporation; Dusan Kraljevic; Jadranka Kraljevic; Jennifer Kraljevic; and Hansen and Hempel Company, Defendants). |
| District & No. | First District, First Division<br>Docket No. 1-10-1316 |
| Filed | August 15, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly found that plaintiff insurer had a duty to defend defendant subcontractor under a comprehensive general liability policy in a third-party action alleging that the subcontractor installed leaky windows in a condominium building, since the underlying pleadings alleged "property damage" resulting from an "occurrence" within the policy's meaning |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-20554; the Hon. Daniel A. Riley, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Novak Law Offices, of Chicago (Neal R. Novak and Reid J. Rozen, of counsel), for appellant. |
| | Law Offices of James A. Smith, of Chicago (James A. Smith, of counsel), and Arnold M. Flank, Ltd., of Northbrook (Arnold M. Flank, of counsel), for appellee. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion. Presiding Justice Hall and Justice Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff, Milwaukee Mutual Insurance Company, n/k/a Milwaukee Insurance Company (Milwaukee Insurance), appeals the trial court's order denying its motion for summary judgment and granting summary judgment in favor of defendant, J.P. Larsen, Inc. (Larsen). Plaintiff contends the trial court erred in finding the underlying pleadings sufficiently established plaintiff had a duty to defend Larsen in a third-party action. Based on the following, we affirm.

¶ 2                                          FACTS

¶ 3     At all relevant times, Milwaukee Insurance provided Larsen with commercial general liability (CGL) insurance and umbrella insurance. In March 2003, Weather-Tite, Inc. (Weather-Tite), hired Larsen as a subcontractor to apply sealant to windows installed by Weather-Tite in a condominium building called Prairie District Homes (PDH). The windows subsequently leaked and caused water damage. On July 29, 2008, the PDH Association filed a third amended verified complaint against, *inter alia*, Weather-Tite for breach of express and implied warranties. On April 23, 2009, Weather-Tite filed a third-party complaint against Larsen alleging that, in the event the PDH Association was successful with its breach of warranty claims, Larsen was liable for contribution as a joint tortfeasor and also alleging Larsen was in breach of contract for failing to add Weather-Tite as an additional insured to its CGL policy.

¶ 4     Weather-Tite and Larsen both tendered defenses to Milwaukee Insurance. Weather-Tite tendered its defense to the PDH Association's third amended verified complaint and Larsen tendered its defense to Weather-Tite's third-party complaint. Milwaukee Insurance denied both defense tenders, finding there was no coverage under the CGL policy where the complaints alleged only construction defects and not "property damage" or an "occurrence"

within the terms of the policy.

¶ 5 On June 25, 2009, Milwaukee Insurance filed a complaint for declaratory judgment against Weather-Tite and Larsen to determine the parties' rights under the CGL policy. Milwaukee Insurance filed a motion for summary judgment, and Weather-Tite and Larsen both filed cross-motions for summary judgment. On March 30, 2010, the trial court entered an order granting Milwaukee Insurance's summary judgment motion as to Weather-Tite, but denying Milwaukee Insurance's summary judgment motion as to Larsen. The trial court granted Larsen's cross-motion for summary judgment against Milwaukee Insurance. This appeal followed.

¶ 6                                                 DECISION

¶ 7 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2002). When cross-motions for summary judgment have been filed, the parties agree there are no genuine issues of material fact and only a question of law is at issue; therefore, the parties invite the trial court to decide the issues based on the record. *Greenwich Insurance Co. v. RPS Products, Inc.*, 379 Ill. App. 3d 78, 84, 824 N.E.2d 1102 (2008). We review an order granting summary judgment *de novo*. *Adames v. Sheahan*, 233 Ill. 2d 276, 296, 909 N.E.2d 742 (2009).

¶ 8 The construction of an insurance policy is a question of law. *CMK Development Corp. v. West Bend Mutual Insurance Co.*, 395 Ill. App. 3d 830, 837, 917 N.E.2d 1155 (2009). In construing the terms of an insurance policy, it is this court's goal to give effect to the intent of the contracting parties by relying on the language used in the signed contract. *Id.* at 837-38. We construe an insurance policy as a whole, using the plain and ordinary meaning of the terms to give effect to every provision. *Id.* at 838. Construction of the policy should include "due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1992). When the policy terms are unambiguous, we must apply them as written; however, if the terms are ambiguous, we must construe them strictly against the insurance company as the drafters of the policy. *CMK Development Corp.*, 395 Ill. App. 3d at 838.

¶ 9 Milwaukee Insurance contends the trial court erred in finding it had a duty to defend Larsen under the parties' CGL policy where the underlying pleadings failed to allege damages within the policy's coverage.

¶ 10 Courts have established a general set of rules regarding a CGL insurer's duty to defend, such that:

> " 'A court must compare the allegations in the underlying complaint to the policy language ***.' [Citations.] The allegations in the underlying complaint must be liberally construed in favor of the insured. [Citation.] ' "An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." ' (Emphasis omitted.)

[Citation.] Where the insurer relies on a provision that it contends excludes coverage to reject a tender of defense, we review the applicability of the provision to ensure it is ' "clear and free from doubt" that the policy's exclusion prevents coverage.' [Citation.]" *National Fire Insurance of Hartford v. Walsh Construction Co.*, 392 Ill. App. 3d 312, 315-16, 909 N.E.2d 285 (2009).

"If recovery is premised on several theories of liability, some of which are excluded from coverage, the insurer is still obligated to defend as long as one theory might possibly fall within the scope of the policy coverage." *Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 289 Ill. App. 3d 819, 821, 682 N.E.2d 362 (1997).

¶ 11      The CGL policy issued by Milwaukee Insurance to Larsen provided:

"We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."

The CGL policy limited coverage to "property damage" that was "caused by an 'occurrence' that takes place in the coverage territory" and "occurs during the policy period." "Property damage" was defined by the policy as: (1) "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it"; or (2) "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." "Occurrence" was defined by the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 12      Turning to the substance of the pleadings, the third amended verified complaint filed by the PDH Association contained two counts against Weather-Tite, breach of the implied warranties of habitability and workmanship and breach of an express warranty. Incorporated by reference into both counts, the PDH Association alleged:

"The Condominium has and continues to experience severe water infiltration due to the faulty construction for which the Developer [18th and Prairie II, L.L.C.] is responsible under its express warranty, including but not limited to the following: installing a window system that does not adequately manage the water which enters the system; failing to install flashing at various locations as required by the architectural drawings and/or improperly installing flashing at various locations; failing to properly install metal base flashing and sealant joints in various locations resulting in deboned, open and split sealant joints in various locations; allowing cracked and deboned mortar joints throughout the masonry; allowing cracks within individual brick masonry and cast stone units at several locations; allowing efflorescence or water infiltration into brickwork[;] allowing loose and displaced cast stone units at various locations; failing to provide proper end dams at various locations; not providing end dams at other locations[;] and failing to complete warranty punch list items."

-4-

Further incorporated by reference to both counts against Weather-Tite, the PDH Association alleged the developer's failures to correct the deficiencies "have and continue to cause damage to the Condominium common elements, the units, and the individual unit owner's personal property. Apart from the property damage, the Association will have to make repairs to correct the design and/or construction defects" with damages estimated between $4 million and $8 million.

¶ 13    Specifically, in the breach of implied warranties count, the PDH Association alleged that "Weather-Tite impliedly warranted to the Unit Purchasers that the Condominium was reasonably fit and suited for the purposes of habitation as a residence" and "individual Unit Owners have sustained loss due to the faulty and defective work" where Weather-Tite failed "to perform its duties with proper workmanship, quality and skill [resulting] in the installation of a window system that does not adequately manage the water which enters the system, resulting in significant and continuing water leakage into the common elements and residential Units of the Condominium." The PDH Association sought "damages in the amount attributable to Weather[-]Tite's breach." With respect to the breach of express warranty count, the PDH Association alleged the "Board and the individual Unit Owners have sustained loss due to the faulty and defective work in the Condominium" done by Weather-Tite and within the one-year requisite warranty period "severe exterior leaks were occurring in various windows of the Condominium" such that damages were sought in the "amount attributable to Weather[-]Tite's breach."

¶ 14    The third-party complaint filed by Weather-Tite against Larsen contained two counts. In the first count, Weather-Tite alleged Larsen was liable for contribution as a joint tortfeasor in the event the PDH Association was successful in its claims against Weather-Tite because Larsen committed one or more "negligent acts and/or omissions," including: "[n]egligently and carelessly failed to follow the blueprints and plans provided for the contemplated construction"; "[c]arelessly and negligently failed to instruct its employees as to the scope of work to be performed in the matter [*sic*] in which it was to be performed"; "[n]egligently and carelessly deviated from the plans and specifications for the proposed caulking and sealing of window frames, panel frames, and louver frames"; "[w]as otherwise careless and negligent in its performance of its work, supervision of its employees"; and "[f]ailed to inspect the area of occurrence." Weather-Tite further alleged that "[a]s a direct and proximate result of one or more of the *** negligent acts or omissions, *** [Larsen] proximately caused and/or contributed to the alleged injuries claimed by" the PDH Association. In the second count, Weather-Tite alleged Larsen breached the parties' subcontract by failing to name Weather-Tite as an additional insured on Larsen's general liability insurance policy, thereby causing Weather-Tite to incur costs, expenses, attorney fees, and potential indemnity obligations.

¶ 15    In order to determine whether Milwaukee Mutual has a duty to defend Larsen, we must ascertain whether the underlying pleadings alleged facts demonstrating "property damage" resulting from an "occurrence" within, or potentially within, the terms of the CGL policy.

¶ 16                                    I. Property Damage

¶ 17    We first consider whether the pleadings alleged "property damage" within the meaning of the CGL policy. Milwaukee Mutual contends it had no duty to defend where the

underlying allegations failed to request "property damages," only requesting recovery of the costs to repair or replace the damaged structure, which are not covered under the CGL policy.

¶ 18    "Property damage" was defined in the CGL policy as "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or [l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." The supreme court has further provided that "to the average, ordinary person, tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in other material dimension. Conversely, to the average mind, tangible property does not experience 'physical' injury if that property suffers intangible damage, such as diminution in value as a result from the failure of a component *** to function as promised." *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 301-02, 757 N.E.2d 481 (2001).

¶ 19    In determining whether there was "property damage," we keep in mind the policy considerations behind CGL insurance. Specifically, the supreme court has said:

> " '[C]omprehensive general liability policies *** are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.' " *Id.* at 314 (quoting *Qualls v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 831, 833-34, 462 N.E.2d 1288 (1984)).

Going further, the appellate court has said:

> "[If] insurance proceeds could be used for damages from defective workmanship, a contractor could be initially paid by the customer for its work and then by the insurance company to repair or replace the work. [Citation.] Treating a CGL policy like a performance bond would be unjust to the CGL insurer, which, in contrast to the surety on a performance bond, cannot bring suit against the contractor for the defective construction." *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 752, 888 N.E.2d 633 (2008) (citing *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 709, 661 N.E.2d 451 (1996)).

¶ 20    In its third amended verified complaint, the PDH Association alleged that, due to faulty construction, the condominium common elements, individual units and unit owners' personal property were damaged. The complaint further stated that *"apart from the property damage*, the Association will have to make repairs to correct the design and/or construction defects" (emphasis added) in the amount of $4 million to $8 million. The allegation was pled against the developer, but was also incorporated into the breach of warranty counts against Weather-Tite. Moreover, in the breach of implied warranty count, the PDH Association alleged Weather-Tite's faulty workmanship caused individual unit owners to sustain losses. The breach of warranty counts, and the allegations incorporated therein, were imputed against Larsen *vis-à-vis* the third-party complaint in which Larsen was alleged to be a joint tortfeasor based on negligence. Although the damages to the common elements, individual units and personal property were not expressly described, we must construe the pleadings liberally to

allow for coverage, or, at least, the potential for coverage. *Walsh Construction Co.*, 392 Ill. App. 3d at 315.

¶ 21 The damages alleged are not merely construction defects, which would constitute economic losses not covered under the CGL policy. The costs described for the construction defects were between $4 million and $8 million. The costs associated with the "property damage" suffered by the individual unit owners was in addition to that sum, according to the complaint. The damages alleged are not intangible or merely associated with the repair or replacement of the faulty window caulking and sealant.

¶ 22 Milwaukee Mutual spends a lot of time in its brief arguing that the allegations against Larsen are based in contract and, therefore, Milwaukee Mutual could have no duty to defend. We disagree. The allegations in the third-party complaint repeatedly state that Larsen negligently completed the job for which it was hired. Thus, although identified as a cause of action for contribution, the allegations of the pleading control over its form and the allegations sounded in negligence. See *Pekin Insurance Co. v. Dial*, 355 Ill. App. 3d 516, 520, 823 N.E.2d 986 (2004) ("[t]he factual allegations of the complaint, rather than the legal theory under which the action is brought, determine whether there is a duty to defend"); *Lyons v. State Farm Fire & Casualty Co.*, 349 Ill. App. 3d 404, 407-10, 811 N.E.2d 718 (2004). Moreover, Milwaukee Mutual fails to acknowledge that allegations based in contract have resulted in duties to defend as long as the damage is not to the actual property the insured was working on but, rather, is to other property caused by the insured's work product. See *Richard Marker Associates, Inc.*, 289 Ill. App. 3d at 820 (duty to defend found where the underlying allegations were for breach of an architectural services agreement in which the insured failed to adequately design the placement and insulation of water and plumbing pipes and breach of a construction contract for a faulty HVAC system).

¶ 23 We conclude the pleadings alleged "property damage" within, or at least potentially within, the definition of the CGL policy.

¶ 24                                             II. Occurrence

¶ 25 We next must consider whether the "property damage" resulted from an "occurrence" within the meaning of the CGL policy. Milwaukee Mutual contends the underlying pleadings do not allege an "occurrence" where the "defects alleged in the [t]hird-[p]arty [c]omplaint are the natural and ordinary consequence of faulty workmanship, and the resulting damage was not caused by an 'accident.' "

¶ 26 As previously stated, "occurrence" was defined in the CGL policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" was not defined in the policy, but courts have agreed that an "accident" is " 'an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character.' " *State Farm Fire & Casualty Co. v. Watters*, 268 Ill. App. 3d 501, 506, 644 N.E.2d 492 (1994) (quoting *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 619, 411 N.E.2d 1157 (1980)). The " 'natural and ordinary consequences of an act do not constitute an accident.' " *Watters*, 268 Ill. App. 3d at 506 (quoting *Freyer*, 89 Ill. App. 3d at 619). In general, " 'there is no "occurrence" when a subcontractor's defective workmanship necessitates removing and repairing work.' " *Viking Construction Management, Inc. v. Liberty Mutual Insurance Co.*,

358 Ill. App. 3d 34, 42, 831 N.E.2d 1 (2005) (quoting Robert J. Franco, *Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies*, 30 Tort & Insurance L.J. 785, 789 (1995)).

¶ 27 This court has repeatedly stated that damage to something other than the project itself *does* constitute an "occurrence" under a CGL policy. *CMK Development Corp.*, 395 Ill. App. 3d at 840 (citing *Stoneridge Development Co.*, 382 Ill. App. 3d at 752). "[D]efective workmanship could be covered if it damaged something other than the project itself." *Stoneridge Development Co.*, 382 Ill. App. 3d at 753. Examples of qualifying other property include damage to a homeowner's furniture, clothing and antiques as a result of the insured's faulty placement and insulation of plumbing and water pipes (*Richard Marker Associates, Inc.*, 289 Ill. App. 3d at 823); damage to cars in a parking garage completed with faulty workmanship by the insured, but not water damage to the lobby and basement, damaged concrete, and cracked floors in the adjoining building built by the same insured (*Wil-Fred's*, 277 Ill. App. 3d at 705); and damage to carpets, upholstery and draperies at a school where the insured incorporated asbestos-containing materials into the building structure (*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 75, 578 N.E.2d 926 (1991)).

¶ 28 In its third amended verified complaint, the PDH Association alleged the installation of a faulty window system resulted "in significant and *continuing* water leakage into the common elements and residential" units. (Emphasis added.) Moreover, as previously discussed, the "property damage" that is, at least possibly, imputed to Larsen through his negligent workmanship included personal property and water damage throughout a building not constructed by Larsen. See *Viking*, 358 Ill. App. 3d at 54 ("negligent workmanship that resulted in damage to something other than the structure worked upon"); *Richard Marker Associates, Inc.*, 289 Ill. App. 3d at 822 (there must be "damage to other materials not furnished by the insured"). Therefore, the underlying pleadings alleged that Larsen's negligent workmanship caused an accident in the form of significant and continuing water leakage. This is more than an allegation that the window sealant and caulking were defective. See *Richard Marker Associates, Inc.*, 289 Ill. App. 3d at 823. We, therefore, conclude that an "occurrence" was pled.

¶ 29                              CONCLUSION

¶ 30 Based on our finding that the pleadings alleged facts that bring the cause within, or at least potentially within, the CGL policy's coverage, we conclude Milwaukee Insurance has a duty to defend Larsen in the third-party action. We affirm the judgment of the circuit court.

¶ 31 Affirmed.