# Illinois Official Reports

## Appellate Court

> ### *Certain Underwriters at Lloyd's London v. Metropolitan Builders, Inc.*,
> ### 2019 IL App (1st) 190517

| | |
|---|---|
| Appellate Court Caption | CERTAIN UNDERWRITERS AT LLOYD'S LONDON, Subscribing to Certificate No. RTS000275-4, Plaintiff-Appellee and Cross-Appellant, v. METROPOLITAN BUILDERS, INC., and AIG PROPERTY CASUALTY COMPANY, as Subrogee of 1903 Schiller, LLC, Defendants (Metropolitan Builders, Inc., Defendant-Appellant and Cross-Appellee). |
| District & No. | First District, Third Division<br>No. 1-19-0517 |
| Filed<br>Rehearing denied | December 18, 2019<br>January 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CH-1180; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Reversed and remanded; cross-appeal dismissed. |
| Counsel on Appeal | David E. Schroeder, of Tribler Orpett & Meyer, P.C., of Chicago, for appellant.<br><br>Neal R. Novak and Karen Andersen Moran, of Novak Law Offices, of Chicago, for appellee. |

Panel PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Metropolitan Builders, Inc. (Metropolitan), appeals the circuit court's order finding that Certain Underwriters at Lloyd's London, Subscribing to Certificate No. RTS000275-4 (Lloyd's), did not have a duty to defend Metropolitan in an underlying case. In its order granting summary judgment to Lloyd's, the court found that the complaint in the underlying case alleged "property damage" but did not allege an "occurrence" within the meaning of the insurance policy.

¶ 2    We hold that the underlying complaint alleged both an "occurrence" and "property damage" under the policy. Metropolitan was thus entitled to a defense from Lloyd's of the underlying lawsuit. We reverse the trial court's judgment and remand for further proceedings.

¶ 3                              BACKGROUND
¶ 4                            A. General Facts
¶ 5    Metropolitan was hired as the general contractor for a construction job on property in Chicago. During the construction, a wall adjoining two structures collapsed. The amount of structural damage ultimately led the City of Chicago (City) to declare the structures unsafe and demolish them.

¶ 6    The owner of the building turned to its insurer, AIG Property Casualty Company (AIG), for indemnification and reimbursement for the damages it suffered. AIG paid the owner "a sum of over $1,802,479.88 for repairs, demolition, construction, and other associated expenses arising from" the collapse.

¶ 7    AIG then invoked its rights of subrogation and filed suit against Metropolitan, the general contractor on the construction job (the Underlying Case). We draw our more detailed facts below from AIG's complaint in that action (the Underlying Complaint).

¶ 8                        B. The Underlying Complaint
¶ 9    Metropolitan was hired as the general contractor for "construction, renovation, demolition, and/or other related activities" at contiguous properties on the 1900 block of West Schiller Street in Chicago—the 1907 Property, 1909 Property, and 1911 Property (collectively, the Properties).

¶ 10    As of October 2016, Metropolitan had obtained a permit from the City to perform construction activity to convert the 1909 and 1911 Properties into single-family dwellings. But as of that time, the City had not given Metropolitan a permit to perform construction activity of any kind on the 1907 Property.

¶ 11    In October 2016, the structures on the 1907 Property and 1909 Property collapsed. We do not know a great deal about how this collapse occurred. The allegations are that Metropolitan had "constructed a new wooden framing building and removed portions of the stairway within

[the 1907 Property], without the authorization of a permit, in addition to altering the structural integrity and lower level supports of [the 1907 and 1909 Properties]."

¶ 12 In any event, the entire existing structures at the 1907 and 1909 Properties collapsed. The collapse caused significant damage to the Properties, "including in areas where [Metropolitan] was not conducting work." The existing structures on the Properties were later deemed unsafe and demolished by the City.

¶ 13 The Underlying Complaint alleged warranty and contract claims, as well as various tort claims, against Metropolitan. The various tort claims each alleged that, "[a]s a result of the aforementioned negligence, [the property owner] suffered losses including, but not limited to, damage to [its] real and personal property."

¶ 14 C. The Declaratory Judgment Action Before This Court

¶ 15 Metropolitan tendered defense of the Underlying Case to its insurer, Lloyd's. Lloyd's denied coverage and filed this declaratory judgment action, seeking a declaration that it owed no duty to defend Metropolitan. In its motion for summary judgment, Lloyd's argued that, while its insurance policy with Metropolitan required Lloyd's to defend Metropolitan for claims of liability resulting from "property damage" caused by an "occurrence," the allegations of the Underlying Complaint alleged *neither* "property damage" nor an "occurrence."

¶ 16 The trial court disagreed in part with Lloyd's, ruling that the Underlying Complaint adequately alleged "property damage." But the court agreed that the Underlying Complaint failed to allege an "occurrence" as defined by the insurance policy and thus entered summary judgment in favor of Lloyd's.

¶ 17 Metropolitan appeals, claiming that summary judgment for Lloyd's was inappropriate, as the Underlying Complaint alleged an "occurrence" as well as "property damage." Lloyd's not only urges affirmance on the basis that the trial court's ruling on the definition of "occurrence" was correct, but it also has cross-appealed as a backstop, arguing that summary judgment could be affirmed for the additional reason (contrary to the trial court's ruling) that the Underlying Complaint did not allege "property damage," either.

¶ 18 JURISDICTION

¶ 19 Our mention of the cross-appeal filed by Lloyd's leads us to a jurisdictional matter that we have an independent duty to address, even if the parties do not. See *Lakeshore Center Holdings, LLC v. LHC Loan, LLC*, 2019 IL App (1st) 180576, ¶ 9.

¶ 20 Lloyd's cross-appeals from the trial court's ruling that the Underlying Complaint alleged "property damage." That cross-appeal is improper because Lloyd's received all the relief it sought below—a grant of summary judgment in its favor. A party granted summary judgment may not appeal that order. *Chicago Tribune v. College of Du Page*, 2017 IL App (2d) 160274, ¶ 28 ("Where the circuit court grants summary judgment in favor of a party, that party cannot file a cross-appeal to seek relief from the summary judgment order.").

¶ 21 We understand that Lloyd's is cross-appealing out an abundance of caution, a belt-and-suspenders approach. In the event we disagreed with the trial court's stated reason for finding no duty to defend—the lack of any allegation of an "occurrence"—Lloyd's would have us affirm on the secondary ground that no "property damage" was alleged, even though the trial court ruled otherwise on that question.

¶ 22    Still, the avenue of a cross-appeal is improper. " 'It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons, conclusion or findings below.' " *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983) (quoting *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 414 Ill. 275, 282-83 (1953)). We must dismiss the cross-appeal.

¶ 23    But this is a pyrrhic defeat only, as Lloyd's remains free to argue that the trial court's order should be affirmed based on the definition of "property damage" as well as "occurrence." We may affirm the judgment of the trial court on any basis in the record, regardless of whether it was the trial court's stated reason. *Material Service Corp.*, 98 Ill. 2d at 387. Indeed, that is precisely why a cross-appeal is both improper and unnecessary—because the appellee may raise this additional basis for affirmance on direct appeal. *Id.*; *Chicago Tribune*, 2017 IL App (2d) 160274, ¶ 28.

¶ 24    So the cross-appeal is dismissed, but we will consider the arguments of Lloyd's regarding the definition of "property damage" as an additional basis for affirmance, if necessary.

¶ 25                                    ANALYSIS

¶ 26    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). We review an order granting summary judgment *de novo*. *Milwaukee Mutual Insurance Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316, ¶ 7.

¶ 27    Generally, in determining an insurer's duty to defend an insured in an underlying suit, we compare the allegations in the underlying complaint against the relevant policy language. *Pekin Insurance Co. v. Centex Homes*, 2017 IL App (1st) 153601, ¶ 34. An insurer has a duty to defend "[i]f the underlying complaints allege facts within or *potentially* within policy coverage." (Emphasis in original.) *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991). This duty arises "even if the allegations are groundless, false, or fraudulent." *Id.*

¶ 28    We liberally construe the underlying complaint and policy in favor of the insured. *Id.* at 74. " 'The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action.' " *Illinois Emcasco Insurance Co. v. Northwestern National Casualty Co.*, 337 Ill. App. 3d 356, 361 (2003) (quoting *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 312 Ill. App. 3d 998, 1007 (2000)). The threshold an underlying complaint must meet to trigger the duty to defend is low. *State Farm Fire & Casualty Co. v. Tillerson*, 334 Ill. App. 3d 404, 408 (2002); *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956, 960 (1991) ("minimal"). An insurer must defend an action "unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or *potentially* within, the policy's coverage." (Emphasis in original.) *Wilkin*, 144 Ill. 2d at 73.

¶ 29    We must decide both whether the Underlying Complaint alleged "property damage" within the meaning of the policy and whether the Underlying Complaint properly alleged that this property damage was caused by an "occurrence" as defined by the policy. If the answer to both of those questions is yes, Metropolitan is entitled to a defense under the policy. If either answer is no, Metropolitan is not, and summary judgment was properly entered in favor of Lloyd's.

## I

Before we dive into an analysis of the individual terms and phrases, we start with some general observations. Metropolitan had a commercial general liability (CGL) policy with Lloyd's that, in pertinent part, insured Metropolitan for liability resulting from " 'property damage' [that] is caused by an 'occurrence.' " The relevant questions here are the meanings of "occurrence" and "property damage."

We have had many occasions to interpret CGL policies in the context of underlying lawsuits against construction contractors, most of which policies contained identical or nearly identical definitions of "occurrence" and "property damage" as here. And as we will see below, much of our analysis in those cases has been driven less by literal textual construction and more by considering the overall purpose of CGL policies.

Indeed, in some cases, we have not even bothered to isolate the two definitions, instead considering them collectively as one phrase ("property damage caused by an occurrence") and determining whether the damages alleged against the contractor in the underlying lawsuit fit within or outside the purpose of CGL policies. See, *e.g.*, *Acuity Insurance Co. v. 950 West Huron Condominium Ass'n*, 2019 IL App (1st) 180743, ¶¶ 29-44. And even when the two definitions are isolated, some courts have used the same reasoning for determining whether an "occurrence" was pleaded as other courts did in determining whether "property damage" was pleaded.

Quite obviously, then, the purpose of CGL policies is an important first consideration. So we start there, with this oft-quoted passage from our supreme court:

> " '[C]omprehensive general liability policies *** are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.' " *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 314 (2001) (quoting *Qualls v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 831, 833-34 (1984)).

We have often emphasized the distinction above, the difference between a CGL policy and a performance bond, in the case law discussing the meanings of "occurrence" and "property damage" in CGL policies. See, *e.g.*, *Viking Construction Management, Inc. v. Liberty Mutual Insurance Co.*, 358 Ill. App. 3d 34, 55 (2005); *Tillerson*, 334 Ill. App. 3d at 410; *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 752 (2008); *Monticello Insurance Co. v. Wil-Freds Construction, Inc.*, 277 Ill. App. 3d 697, 709 (1996).

Sureties offer performance bonds to the property owner to guarantee the performance of a contractor's *contractual* obligations on a construction project. See *Fisher v. Fidelity & Deposit Co. of Maryland*, 125 Ill. App. 3d 632, 639 (1984) ("[w]here a bond guarantees performance, the obligation of the contractor in legal effect becomes the obligation of the surety" (internal quotation marks omitted)). If the contractor fails to complete the project or performs in a substandard manner, the property owner can sue or demand performance directly from the surety, either by requiring the surety to complete the work in a timely and acceptable manner or by making the surety pay any excess costs incurred by the property owner to complete the work itself. See *id.*; see also *Lake View Trust & Savings Bank v. Filmore Construction Co.*, 74 Ill. App. 3d 755, 758 (1979).

¶ 37    The difference, however, is if the surety were made to pay or perform on the performance bond, the surety could then sue the contractor for recovery for defective construction work. See *Stoneridge*, 382 Ill. App. 3d at 752; *Wil-Freds*, 277 Ill. App. 3d at 709. The surety on a performance bond, then, is not an "insurer" of the contractor in the classic sense. It guarantees the contractor's *performance* to a third party (the property owner), but it can turn around and seek recovery against that contractor for any moneys it was forced to pay due to the contractor's breach of contract.

¶ 38    Contrast performance bonds with a more traditional insurance contract like a CGL policy. For one thing, the CGL insurer cannot sue the insured contractor to recoup money it paid on its behalf. *Stoneridge*, 382 Ill. App. 3d at 752; *Wil-Freds*, 277 Ill. App. 3d at 709. If a CGL policy covered simple economic loss stemming from a contractor's breach of contractual obligations, the contractor would be paid initially by the property owner to perform the (shoddy) work and then would get paid by the insurance company to repair or replace that (shoddy) work product, in essence an unfair and inappropriate double recovery—and a reward for poor performance. See *Stoneridge*, 382 Ill. App. 3d at 752; *Wil-Freds*, 277 Ill. App. 3d at 709.

¶ 39    Another and more fundamental difference is that the CGL insurer is not guaranteeing the contractual performance of work; instead, as our supreme court noted, a CGL policy "protect[s] the insured from liability for injury or damage to the persons or property of others." (Internal quotation marks omitted.) *Travelers Insurance*, 197 Ill. 2d at 314. That is to say, it covers " '*tort* liability for damage to other property, not for the insured's contractual liability for economic loss.' " (Emphasis added.) *Stoneridge*, 382 Ill. App. 3d at 753 (quoting *Tillerson*, 334 Ill. App. 3d at 410); see also *Viking Construction*, 358 Ill. App. 3d at 42 ("It has generally been held that a CGL policy will not cover a general contractor's suit for breach of contract ***." (Internal quotation marks omitted.)).

¶ 40    As we will see below, this distinction between damage to other property, usually redressed in tort, and purely economic loss or disappointed expectations, typically remedied in a contract claim, has served as the guiding principle in determining the definitions of both "occurrence" and "property damage" in CGL polices involving lawsuits against insured contractors.

¶ 41                                    II

¶ 42    We begin with Metropolitan's claim that the trial court erred in ruling that the Underlying Complaint did not adequately allege an "occurrence" as defined in Metropolitan's CGL policy with Lloyd's (the Policy). Again, the Policy insured Metropolitan against liability for " 'property damage' [that] is caused by an 'occurrence.' "

¶ 43    An "occurrence" under the Policy is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Because we are not talking here about any kind of continuous-exposure harm like radon radiation, asbestos exposure, or lead poisoning, we can eliminate the second portion of the definition here and say that the Policy defines an "occurrence" as an "accident."

¶ 44    But the Policy contains no definition of "accident." That seems to be a common feature of CGL policies, defining an "occurrence" as did the Policy here and omitting any corresponding definition of "accident." See, *e.g.*, *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 10 (identical definition of "occurrence" with no definition of "accident"); *J.P. Larsen*, 2011 IL App (1st)

101316, ¶ 25 (same); *Stoneridge*, 382 Ill. App. 3d at 749 (same); *Viking Construction*, 358 Ill. App. 3d at 37 (same).

¶ 45    In the absence of a policy definition, Illinois courts typically interpret "accident" to mean " 'an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character.' " *Stoneridge*, 382 Ill. App. 3d at 749 (quoting *Westfield National Insurance Co. v. Continental Community Bank & Trust Co.*, 346 Ill. App. 3d 113, 117 (2003)); see also *id.* at 749-50 (collecting cases).

¶ 46    Reading that definition alone, one might think that what constitutes an "accident" (and thus an "occurrence") would depend on what happened and how it happened—whether the event was sudden, unexpected, etc. But as previewed above, the case law has focused at least as much on the purposes of CGL policies as it has on textual interpretation and application.

¶ 47    We have held, for example, that because CGL policies are "not intended to pay the costs associated with repairing or replacing the insured's defective work and products" (internal quotation marks omitted) (*Travelers Insurance*, 197 Ill. 2d at 314), a lawsuit alleging only those damages against the insured contractor is not deemed to be alleging damages resulting from an "accident," and thus no "occurrence" has been pleaded to trigger coverage under the CGL policy. As our supreme court has said and we have reiterated, a CGL policy " ' "does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." ' " *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 26 (quoting *Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 289 Ill. App. 3d 819, 823 (1997), quoting *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 498 (1985)).

¶ 48    Simply put, " 'there is no occurrence when a subcontractor's defective workmanship necessitates removing and repairing work.' " (Internal quotation marks omitted.) *J.P. Larsen*, 2011 IL App (1st) 101316, ¶ 26 (quoting *Viking Construction*, 358 Ill. App. 3d at 42). Rather, the mere repair or replacement of a contractor's poor work product is considered to be the " 'natural and ordinary consequences of faulty workmanship,' " not an " 'accident.' " *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 28 (quoting *Tillerson*, 334 Ill. App. 3d at 409); *Wil-Freds*, 277 Ill. App. 3d at 705; *Indiana Insurance Co. v. Hydra Corp.*, 245 Ill. App. 3d 926, 930 (1993) ("The natural and ordinary consequences of an act do not constitute an accident.").

¶ 49    For example, if windows were improperly sealed and thus leaked water, the mere cost of repairing and replacing those windows would not be deemed the result of an "accident," and thus no "occurrence" would be alleged under the CGL policy. See *J.P. Larsen*, 2011 IL App (1st) 101316, ¶¶ 27-28. So, too, if a school's wall collapsed but the only damages alleged were the cost of repair or replacement of that wall, without any claim of damages to other parts of that school; the damage is not deemed to be the result of an "accident" or "occurrence" under the CGL policy. See *Viking Construction*, 358 Ill. App. 3d at 42, 55.

¶ 50    Likewise, a building owner's lawsuit against a contractor for the cost of repairing cracks in the flooring and loose paint on the walls did not constitute damages resulting from an "accident" or "occurrence" under the contractor's CGL policy, as the floor cracks and loose paint were merely "the natural and ordinary consequences of installing defective concrete flooring and applying the wrong type of paint." *Hydra Corp.*, 245 Ill. App. 3d at 930. A lawsuit against an insured contractor, alleging that the house the contractor built had an unstable foundation due to the contractor's failure to compact the soil beneath the foundation, did not allege an "occurrence" under the CGL policy because the cracks that formed were the mere

natural and ordinary result of faulty soil compaction and the damage was merely to the house itself—the contractor's work product. *Stoneridge*, 382 Ill. App. 3d at 753.

¶ 51    This principle has been extended to situations where other parts of the same construction project, over which the insured contractor had responsibility, are also damaged. In that situation, as well, the damage is not deemed to be the result of an "accident" or "occurrence" but, rather, the natural and ordinary consequence of faulty workmanship. For example, if leaky windows led to water damage in other parts of the same structure that the insured contractor was building and over which that contractor had responsibility—the lobby, the basement, an adjoining building—the damage is not deemed to be the result of an "accident." See *Wil-Freds*, 277 Ill. App. 3d at 705. The reasoning is the same: the areas that were damaged were part of the same construction project and part of that contractor's overall responsibility; the work was allegedly done in a poor manner; the cost of repairing or replacing shoddy work is an ordinary and natural consequence of poor workmanship.

¶ 52    On the other hand, recall our supreme court's reminder that the purpose of a CGL policy is to protect the insured "from liability for injury or damage to the persons or property of others." (Internal quotation marks omitted.) *Travelers Insurance*, 197 Ill. 2d at 314. Thus, we have been careful to emphasize that when the underlying lawsuit against the insured contractor alleges damages *beyond* repair and replacement, and *beyond* damage to other parts of the same project over which that contractor was responsible, those additional damages are deemed to be the result of an "accident." See *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 29 ("[w]e have repeatedly recognized that while a CGL policy will not insure a contractor for the cost of correcting construction defects, 'damage to something other than the project itself *does* constitute an "occurrence" under a CGL policy' " (emphasis in original) (quoting *J.P. Larsen*, 2011 IL App (1st) 101316, ¶ 27)).

¶ 53    So while the repair or replacement of defective plumbing is not deemed to be damages resulting from an "accident," allegations of water damage to a homeowner's furniture, clothing, and antiques *would* trigger coverage under a CGL policy because that damage extends beyond the contractor's work product to the homeowner's personal property. *Richard Marker*, 289 Ill. App. 3d at 823.

¶ 54    As another example cited by the parties, the cost of repairing or replacing a poorly built second-story structure over an existing garage does not trigger coverage under the CGL policy, but damage to the garage below it, which was not part of the contractor's work, *would* be covered. See *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146, 1148-49 (7th Cir. 1987) (applying Illinois law and stating, "[h]ad Bazzi contracted to construct an entirely new building for [the owner], any damage to or defects in that building, which would be defined as the property or work product of Bazzi, would not be covered under the policy," but "[b]ecause [the owner's] complaint alleges damage to property *other than Bazzi's own work or product*, namely the structure of the existing garage, *** the [underlying complaint] states a claim for property damage that is potentially within the coverage of the [CGL] policy" (emphasis added)).

¶ 55    Likewise, water leakage caused by poorly insulated windows, which damages other parts of the same structure the contractor erected, are not covered—it would be part of the repair and replacement for shoddy workmanship—but had the water leakage damaged homeowners' cars parked inside the parking garage, we had "little doubt" that such damage to personal property

would have been deemed to have resulted from an "accident" under the CGL policy. *Wil-Freds*, 277 Ill. App. 3d at 705.

¶ 56 The upshot is that, in cases involving CGL policies with a definition of "occurrence" identical or functionally identical to the one here, the rule is as follows: If the underlying complaint against the insured contractor merely alleges construction defects that require repair and replacement (or that cause a diminution in value) of the contractor's work product, no "accident," and thus no "occurrence" under the CGL policy, has been alleged. But if the damage extends to other people or things that were not part of the contractor's work product, we have held that this damage is alleged to have resulted from an "accident," and thus an "occurrence" has been alleged to trigger coverage under the CGL policy.

¶ 57                                                        III

¶ 58 We turn now to the meaning of "property damage" under the Policy. The Policy defines "property damage" in relevant part as "physical injury to tangible property, including all resulting loss of use of that property." Our supreme court has explained that:

> "[T]o the average, ordinary person, tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in other material dimension. Conversely, to the average mind, tangible property does not experience 'physical' injury if that property suffers intangible damage, such as diminution in value as a result from the failure of a component ***." *Travelers Insurance*, 197 Ill. 2d at 301-02.

¶ 59 Determining whether property is "altered in appearance, shape, color or in other material dimension" (*id.* at 301) is easy enough. But that determination is not enough by itself. As we noted at the outset, beyond the mere textual meaning of the phrase, many of the same considerations that drive the definition of "occurrence" have led courts to reach the same conclusions with regard to the presence or absence of allegations of "property damage," at least in cases where the definition of "property damage" mirrored the one here.

¶ 60 That is to say, when the "property" that is alleged to be "damaged" in the underlying lawsuit against the construction contractor is merely the contractor's work product, then in essence the only damage is the disappointed commercial expectations of the property owner, and the damages alleged are purely economic losses for the cost of repair and replacement of the contractor's work product or for the property's diminution in value. In those instances, we have held that no "property damage" was alleged to trigger coverage under the CGL policy.

¶ 61 For example, when we held that the homeowners' lawsuit against a contractor for building the house on an unstable foundation did not allege an "occurrence" because the resulting cracks in the contractor's work product were the natural and ordinary consequence of poor workmanship, we also held that the cracks that developed in the home did not constitute "property damage" under the CGL policy. *Stoneridge*, 382 Ill. App. 3d at 753. Even though the cracks obviously constituted an alteration in the house's appearance, we held that the homeowners were alleging purely economic losses for repair, replacement, and diminution in value of the home. *Id.*

¶ 62 We reached the same decision, on nearly the same facts, in *Tillerson*, 334 Ill. App. 3d at 409, where homeowners sued the insured contractor for building an addition to a house on an uneven foundation, resulting in the addition being uninhabitable. We found no "accident" and thus no "occurrence" under the contractor's CGL policy because the damage to the contractor's

- 9 -

work product was just the natural result of defective workmanship (*id.*), but we also found that the damage to the house was not "property damage," as the homeowners "merely [sought] either the repair or the replacement of defective work or the diminishing value of the home," which we deemed "economic loss" only (*id.* at 410).

¶ 63    Likewise, when we determined that the collapse of a masonry wall at a middle school did not constitute an "accident" or "occurrence" under the contractor's CGL policy because the only damages alleged were the cost of repair and replacement of that wall, we likewise held that the collapsed wall did not constitute "property damage" under the policy. *Viking Construction*, 358 Ill. App. 3d at 55. Much as we did in interpreting the word "occurrence," we reasoned that CGL policies are not intended to cover purely economic loss for the repair or replacement of defective work, and interpreting them in that manner would have the effect of converting CGL policies into performance bonds. *Id.* Thus, though it was beyond obvious that the masonry wall had been altered in appearance—it went from a standing wall to a rubble of bricks—it was not "property damage" because the replacement costs were purely economic contractual damages. *Id.* at 55-56.

¶ 64    Along those same lines, when we have found that damages from a contractor's defective work *were* alleged to have resulted from an "occurrence," we have relied on much of the same reasoning for determining that "property damage" was alleged, as well. In *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 7, the underlying complaint alleged that a subcontractor's faulty installation and caulking of doors and windows in a segregated portion of a condo building resulted in water damage throughout the building. Because the subcontractor had only this particular responsibility on a preexisting building, we held that damage to other parts of that building, completely unrelated to the scope of the subcontractor's isolated work, constituted damage to something other than the project itself, requiring something more than mere repair and replacement of the subcontractor's work product, and thus was the result of an "accident" or "occurrence" under the CGL policy. *Id.* ¶¶ 29, 44. And for the same reason, we found that this damage to other parts of the building constituted "property damage" under the policy. *Id.*

¶ 65    The prevailing rule, then, is that to constitute "property damage" in these CGL policies with definitions like the one here, the property's appearance must be altered in some measurable way, but it must also be property beyond that of the contractor's work product. If the only property injured is the very project on which the contractor was working—the windows it installed or sealed, the wall it built, the house it erected—then the damages sought are merely economic losses stemming from disappointed commercial expectations. They are *contractual* damages for the cost of repair or replacement or to make the property owner whole for the diminution in the property's value. And such damages are not recoverable in a CGL policy. But again, allegations of damage to property other than the project itself, requiring more than mere repair or replacement, constitute "proper damage" under the CGL policy.

¶ 66                                                    IV

¶ 67    As mentioned at the outset and as shown above, there is considerable overlap between the analyses of the definition of "occurrence" and that of "property damage," at least with regard to the standard definitions of those terms found in the CGL policies in those cases, which are the same or substantively identical to the ones in our case. While it may seem curious that essentially the same analysis underlies the definitions of two very different phrases— "occurrence" and "property damage"—the case law has been, if nothing else, consistent in this

- 10 -

analysis. Whatever we may think of the merging of these analyses, we are not inclined to swim against a tidal wave of decisions on this subject, only some of which we have cited in this opinion. The case law is too settled and consistent to depart from it.

¶ 68 But we would be remiss not to add one caveat, which should be obvious: Not all insurance contracts are the same and presumably not all CGL policies are, either. However helpful general discussions about the purposes of CGL policies may be, the language of the insurance policy should always be the primary focus when construing an insurance policy. The words the parties choose are the words that bind them, and the words a court should interpret and enforce. A future CGL policy might have very different language that might compel different interpretations and maybe different outcomes.

¶ 69 Here, however, the cases we have cited above all considered definitions of "occurrence" and "property damage" in CGL policies that are identical to, or so nearly so as to be indistinguishable from, the definitions in the Policy here. So we will follow the abundant case law that has developed regarding these definitions, with the caveat that no court should blindly adhere to this precedent without first comparing the relevant language in an insurance policy with the ones in the cases we have cited, including this opinion.

¶ 70                                                            V

¶ 71 We now analyze the allegations in the Underlying Complaint to determine whether they allege "property damage" that was caused by an "occurrence."

¶ 72 A brief reminder of the Underlying Complaint's allegations, which AIG brought as subrogee of the property owner: The owner of the 1907, 1909, and 1911 Properties hired Metropolitan "as general contractor for renovation, demolition, construction, and/or other related activities," the point being the conversion of (some or all of) the existing structures on the Property into single-family dwellings. In the course of conducting construction activities, Metropolitan built a new wooden framing building and removed portions of the stairway inside the 1907 Property. Metropolitan's defective construction work resulted in altering the structural integrity and lower level supports of both the 1907 and 1909 Properties, causing their collapse. As a result, all three of the buildings on the Properties were demolished by the City, which deemed them unsafe.

¶ 73 AIG has paid the property owner "a sum of over $1,802,479.88 for damage to the real property, repairs, demolition, construction, and other associated expenses arising from the [collapse of the buildings]."

¶ 74 The Underlying Complaint, among other things, raises several theories of recovery sounding in tort. In each of those counts, the Underlying Complaint alleges two different kinds of damages suffered by the property owner: "losses including, but not limited to, damage to both [the property owner's] real and personal property."

¶ 75 We readily agree with Lloyd's that the damage to the real property is not covered by the CGL policy. Metropolitan was the general contractor on the job, with overall responsibility for the renovation and conversion of the Properties' existing structures into single-family housing. Instead of rehabbing and converting them, Metropolitan's allegedly faulty workmanship led to their collapse and ultimate demolition. Thus, the collapse of the structures was not an "accident" or "occurrence" but was, instead, the natural and ordinary result of faulty workmanship on the contractor's work product. See, *e.g.*, *Viking Construction*, 358 Ill. App.

3d at 42; *Stoneridge*, 382 Ill. App. 3d at 753; *Hydra Corp.*, 245 Ill. App. 3d at 930; *Wil-Freds*, 277 Ill. App. 3d at 705.

¶ 76    For many of the same reasons, the damage to the real property did not constitute "property damage" under the Policy, either. The damages suffered by the property owner (as to the real property) was nothing but economic loss—the cost of repair and replacing the demolished buildings to fulfill the owner's contractual expectations of Metropolitan to build single-family dwellings. See, *e.g.*, *Stoneridge*, 382 Ill. App. 3d at 753; *Tillerson*, 334 Ill. App. 3d at 410; *Viking Construction*, 358 Ill. App. 3d at 55-56.

¶ 77    Metropolitan argues that the Underlying Complaint alleged damage to parts of the Property on which Metropolitan was not working. So it did, but that does not change our conclusion. The Properties were under the responsibility of Metropolitan, as general contractor, to convert the structures into single-family homes. Even if the damage extended to parts of the project on which Metropolitan was not currently working, it was still part of Metropolitan's scope and responsibility, and thus was part of the project itself. See *Wil-Freds*, 277 Ill. App. 3d at 705.

¶ 78    We reach a different conclusion, however, with regard to the second claim of damages alleged in the Underlying Complaint—the claim of damage to the property owner's "personal property." As we have explained, when a construction defect results in " 'damage to something other than the project itself,' " the damages are deemed to have been the result of an "accident" and thus an "occurrence" under the CGL policy. *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 29 (quoting *J.P. Larsen*, 2011 IL App (1st) 101316, ¶ 27); see also *Richard Marker*, 289 Ill. App. 3d at 823; *Bazzi Construction*, 815 F.2d at 1148-49; *Wil-Freds*, 277 Ill. App. 3d at 705.

¶ 79    The damage alleged to the property owner's personal property is, quite obviously, damage to something other than the project itself. To be sure, the Underlying Complaint gives no description whatsoever of what "personal property" of the owner was damaged—furniture, computers, appliances, keepsakes, etc. We do not know anything about these buildings on the Property before Metropolitan began renovation—whether they were office buildings, personal residences of some sort, or what have you. We have no clue whatsoever about this alleged damage to the owner's personal property.

¶ 80    It is the unspecified nature of that personal property, in fact, that leads Lloyd's to argue that no damage to personal property has been alleged whatsoever. Lloyd's says that this "free-standing reference" to personal property, without any reference to the type or nature of the personal property, is insufficient.

¶ 81    We disagree for two reasons. The first is that, while we may not know much about this personal property, we do know to whom it belonged—the property owner. That, in itself, distinguishes this case from *Westfield Insurance Co. v. West Van Buren, LLC*, 2016 IL App (1st) 140862, ¶ 20, cited by Lloyd's, where the "personal property" alleged to be damaged was not the building owner's, leaving the majority to question how the building owner even had the right to sue for such damages. Here, in contrast, the property owner unquestionably has the right to sue for injury to its own personal property.

¶ 82    More to the point, we have specifically rejected the notion that the alleged damage to "personal property" must be specifically identified in the underlying complaint to trigger coverage for an "occurrence." See *J.P. Larsen*, 2011 IL App (1st) 101316, ¶ 20 ("Although the damages to the common elements, individual units and personal property were not expressly described, we must construe the pleadings liberally to allow for coverage, or, at least, the potential for coverage."). Recall that, in considering whether an insurer has a duty to defend,

we read the underlying complaint and the insurance policy in favor of coverage "unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." (Emphasis omitted.) *Wilkin*, 144 Ill. 2d at 73. It is certainly *not* "clear" from the Underlying Complaint that the allegation of damage to the owner's personal property falls outside the definition of "occurrence."

¶ 83    Lloyd's also argues that the Underlying Complaint could not be alleging damage to the owner's personal property because it does not allege that AIG *paid* the owner for any damage to personal property and, as the subrogee stepping into the shoes of the owner, AIG can only recover from the contractor the money that it paid out in claims to the owner. Simply put, if AIG did not pay the owner any money in claims for damage to personal property, then it cannot seek damages in the Underlying Complaint for damage to the owner's personal property.

¶ 84    Again, we agree that the Underlying Complaint is somewhat vague on this point, but it is sufficient under the lenient standard we must apply. It is not "clear from the face of the underlying complaint" (*id.*) that AIG did *not* cover claims of damage to the owner's personal property. For one thing, we have no idea what AIG's policy with the owner did or did not cover; the policy was not attached to the Underlying Complaint. One would think that a policy insuring an owner's home or building would include some provision for the contents, too—the personal property within the structure. But the fact remains that we do not know, and if we were to assume (somewhat against reason) that AIG's policy did *not* cover personal property, we would not be interpreting the Underlying Complaint liberally in favor of coverage; we would be doing the precise opposite.

¶ 85    And the relevant allegations in the Underlying Complaint, at a minimum, do not foreclose the possibility that AIG paid the owner for damage to personal property. In the provision cited by Lloyd's, AIG alleged that it has paid the owner "a sum of over $1,802,479.88 for damage to the real property, repairs, demolition, construction, *and other associated expenses*" arising from the collapse of the buildings. It does not explain what "other associated expenses" means. We see no reason why that could not include payment for damage to the owner's personal property. Maybe the amount of personal property damage, compared to the massive cost of rebuilding three structures from scratch, was minor enough to warrant only a mention in wrap-up language like "other associated expenses." A liberal reading surely would not *exclude* that possibility.

¶ 86    And each count of the Underlying Complaint specifically alleges damage to the owner's personal, as well as real, property. One might ask why AIG would seek damages for the owner's personal property loss if AIG was not prepared to prove (as it would be required to do) that it first paid out money on personal-property claims. Unless we were to assume that AIG was filing a frivolous pleading, then, we would assume that AIG is seeking damages for the owner's personal property because it *paid out* on those claims to the owner. And at this stage, under this lenient standard, we are not permitted to inquire into whether the underlying allegations are frivolous. See *id.* (duty to defend arises "even if the allegations are groundless, false, or fraudulent").

¶ 87    Thus, however vague they may be, the Underlying Complaint's allegations at least potentially satisfy the Policy's definition of "occurrence."

¶ 88    And because the damage to the owner's personal property is beyond a mere contractual-damages claim for repair or replacement of the contractor's work product, it likewise

constitutes "property damage" under the Policy. See, *e.g.*, *Bazzi Construction*, 815 F.2d at 1148-49; *Acuity Insurance*, 2019 IL App (1st) 180743, ¶ 29.

¶ 89 In sum, these admittedly vague references to damage to the property owner's "personal property" are enough to allege "property damage" caused by an "occurrence" under the Policy. The allegations are enough to trigger the insurer's duty to defend.

¶ 90 If the insured is entitled to a defense of any portion of an underlying complaint, the insured is entitled to a defense of that entire lawsuit. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 453 n.2 (2010) ("if [the insurer] has a duty to defend as to at least one count of the lawsuit, it has a duty to defend in all counts of that lawsuit"); *Wilkin*, 144 Ill. 2d at 73 ("if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy"). So even though the vast majority of the damages alleged in the Underlying Complaint appear to relate to noncovered damages to the real property and the project itself, the allegations of damage to the owner's "personal property" triggers the insurer's duty to defend the entire action. And for that same reason, we need not consider the contract claims in the Underlying Complaint, for the tort claims alone are sufficient to trigger the duty to defend.

¶ 91 We express no opinion on any duty on the part of Lloyd's to indemnify Metropolitan. That question is not before us. We hold only that the Underlying Complaint alleges sufficient facts to require Lloyd's to defend Metropolitan. The trial court thus erred in granting summary judgment in favor of Lloyd's.

¶ 92 CONCLUSION

¶ 93 The judgment of the trial court is reversed. The cause is remanded for further proceedings consistent with this opinion. The cross-appeal is dismissed.

¶ 94 Reversed and remanded; cross-appeal dismissed.